**FINE FOLIAGE OF FLORIDA, INC.,**
Plaintiff–Appellee,

v.

**BOWMAN TRANSPORTATION, INC.,**
Defendant–Appellant.

No. 89–3057.

United States Court of Appeals,
Eleventh Circuit.

May 22, 1990.

Kenneth E. Cohen, Kroll & Tract, Miami, Fla., for defendant-appellant.

Harlan L. Paul, Zimmerman, Paul & Baler, DeLand, Fla., for plaintiff-appellee.

Before KRAVITCH and CLARK, Circuit Judges, and ATKINS *, Senior District Judge.

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sit-

KRAVITCH, Circuit Judge:

This case involves an appeal by a common carrier, Bowman Transportation, Inc. ("Bowman"), from the district court's order finding it liable to Fine Foliage of Florida, Inc. ("Fine Foliage"), for the value of ferns damaged due to an incorrect temperature setting on a refrigerated container unit. Bowman contends that the lower court erred in finding that Fine Foliage established a prima facie case under the Carmack Amendment, 49 U.S.C. § 11707, and that it erred in finding that a protective service tariff that Bowman had on file with the Interstate Commerce Commission ("ICC") did not release it from liability for faulty refrigeration under the Carmack Amendment. Because we find that the district court ruled correctly on both of these issues, we affirm.

## I. Background

Fine Foliage, a Florida corporation located in DeLeon Springs, Florida, is a grower and international shipper of decorative ferns used in floral arrangements. Bowman is an interstate trucking company that was employed for the inland transportation of the ferns from DeLeon Springs, Florida to Savannah, Georgia.

In April of 1987, Fine Foliage, through its freight forwarder, Wilk Forwarding Company ("Wilk"), arranged for the shipment of 939 cartons of leatherleaf fern from DeLeon Springs, Florida to Tokyo, Japan. Wilk arranged to have Bowman undertake the inland transportation from DeLeon Springs to Jacksonville, Florida and then arranged for sea passage with Mitsui Lines ("Mitsui"). Mitsui arranged through its agent, Strachan Shipping, to have the ferns transported by Bowman from a terminal in Jacksonville to its port in Savannah.

The bill of lading covering the DeLeon Springs to Jacksonville portion of the trip specified that the ferns were to be transported by Bowman at a temperature of 39° Fahrenheit. The bill also had printed on it the words "PERISHABLE Keep From

ting by designation.

Heat or Frost." Leonard Davis, Bowman's driver, testified that he signed the bill of lading without reading it. Testimony at trial established, however, that it is common knowledge among fern growers and truck drivers who transport ferns that the plant must be shipped at temperatures between 38° and 40° Fahrenheit. Davis testified that he knew that ferns should be shipped between 38° and 40°. Testimony at trial further established that if ferns are exposed to freezing temperatures for a sufficient period of time, the plant cells are destroyed and the rotting process commences. According to testimony, the ferns may appear dark green in a not-completely thawed state, but three to five hours after thaw, the ferns become brown.

Perishable items such as ferns are shipped in refrigerated containers known in the industry as "reefers." In order to ensure that proper temperatures are maintained during shipping, it is customary to place a specialized recording device known as a Ryan recorder into the reefer when the ferns are loaded. At the end of the inland transportation, before the ferns are unloaded for the overseas portion of the shipment, the temperature chart drawn by the recorder is consulted. If there has been a deviation from the required temperature, a survey of the ferns is made to determine if they have been damaged before the shipment is sent abroad.

Davis obtained the reefer at Bowman's Jacksonville yard where Bowman had leased it from General Transportation Services ("GTS"). A Ryan recorder was placed in the container and Davis signed the receipt for the recorder. A GTS equipment interchange receipt states that the temperature of the container was set at 39° Fahrenheit. According to Davis, the temperature setting on the reefer had been preset by GTS. Davis simply "fired the container up" to turn on the container's cooling system and then drove to DeLeon Springs where he was to pick up the ferns. Davis testified that he slept overnight at DeLeon Springs. Apparently, the blower on the cooling system did not work properly during the night because the container had not been properly cooled and had to be turned on again in the morning. Davis testified that Fine Foliage employees punched the reset button and then, after allowing the container time to cool, the ferns were loaded by Fine Foliage employees. Davis then drove the ferns to Savannah. The trip took approximately five hours.

Inspection of the temperature chart at the Savannah port indicated that the temperature in the container had been set improperly at zero degrees. Strachan therefore requested a survey of the ferns, which was performed by a Savannah marine surveyor. The surveyor described his inspection of the ferns as follows:

> Two of the cartons were removed from the container and opened. The cargo, i.e.: fern, were packaged in clear plastic.... A thin layer of ice was sighted on the ferns resting on the top layer. No ice was sighted on the other layers. Random spike temperatures were taken in two of the cartons with a reading of 42 degrees F. low and 44 degrees F. high.
>
> The refrigerator unit had been turned off and was not operating when the undersigned arrived at the container. Also the disc had been removed approximately one hour before the survey was performed. At the time the disc was removed it showed a temperature reading of 0 degrees F. which is the temperature the unit had been set for when it left DeLeon Springs. This of course was an improper setting for the type of cargo being shipped in the container. The proper setting should have been 39 degrees F.
>
> The cargo did not appear to be damaged because of the low setting of the temperature (0 degrees F.). The ice sighted on the top layers melted quickly when exposed to the sun light. There was no evidence of discoloration or brittleness or any other damage to the cargo itself.

Based on this survey, Mitsui decided to continue the shipment of the ferns to Tokyo. In its bill of lading for the ocean going portion of the trip, however, it specified the following exception:

EXCEPTION: CONTAINER RE-
CEIVED BY CARRIER SET AT ZERO
DEGREES FARENHEIT [sic]. CARRI-
ER NOT RESPONSIBLE FOR POSSI-
BLE DAMAGE TO CARGO DUE TO
INCORRECT TEMP. SETTING.

When the ferns arrived in Tokyo, Fine
Foliage's consignee, Classic Japan, with
whom it had been doing business for ten
years, requested a survey. The survey
found that the 939 cartons were a "total
loss." As the cause of damage, it stated
that:

> The fern, stowed in container No.
> MOLU–5020134 must have been exposed
> in lower carrying temperature and frozen
> and then, the ferns were thawed during
> the transportation of the shipper's yard
> and Barden [sic] city terminal, Savannah
> and the damage must have aggravated
> little by little.

Classic Japan notified Fine Foliage of its
liability for the loss and Fine Foliage sued
Bowman for $21,000, alleging that the
ferns were destroyed because of defen-
dant's failure to maintain the requested 39°
Fahrenheit temperature. Apparently there
were no complaints regarding other ferns,
sent abroad and stored in the same cooler
on the ship. Fine Foliage sued Bowman
under the Carmack Amendment and under
a theory of common law negligence.

## II. The Carmack Amendment

The district court found this action con-
trolled by the Carmack Amendment to the
Interstate Commerce Act, 49 U.S.C.
§ 11707 (formerly 49 U.S.C. § 20(11)). On
appeal, Bowman does not dispute that the
Carmack Amendment is controlling.

■ The Carmack Amendment provides
that a common carrier is liable for the
actual loss or injury to goods in an inter-
state commerce shipment. It states in part
that:

> A common carrier providing transporta-
> tion or service subject to the jurisdiction
> of the Interstate Commerce Commission
> ... and a freight forwarder shall issue a
> receipt or bill of lading for property it

receives for transportation under this
subtitle. That carrier or freight for-
warder and any other common carrier
that delivers the property and is provid-
ing transportation or service subject to
the jurisdiction of the Commission ...
are liable to the person entitled to recov-
er under the receipt or bill of lading....
Failure to issue a receipt or bill of lading
does not affect the liability of a carrier or
freight forwarder.

49 U.S.C. § 11707(a)(1). The purpose of
the Carmack Amendment is to protect ship-
pers against the negligence of interstate
carriers and "to relieve shippers of the
burden of searching out a particular negli-
gent carrier from among the often numer-
ous carriers handling an interstate ship-
ment of goods." *Reider v. Thompson*, 339
U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed.
698 (1950). Once liability is established,
the defendant carrier may then seek to
recover damages from the connecting carri-
er which had possession of the goods when
loss was sustained. *Arnold J. Rodin, Inc.
v. Atchison, T. & S.F. Ry. Co.*, 477 F.2d
682, 688 (5th Cir.1973).[1]

### A. Fine Foliage's Prima Facie Case

■ A shipper establishes a prima facie
case of the carrier's negligence and liability
under the Carmack Amendment by evinc-
ing proof by a preponderance of the evi-
dence that the goods "1) were delivered to
the carrier in good condition, 2) arrived in
damaged condition, and 3) resulted in the
specified amount of damage." *Offshore
Aviation v. Transcon Lines, Inc.*, 831 F.2d
1013, 1014 (11th Cir.1987) (per curiam).

At trial, Fine Foliage put forth evidence
in support of each of these elements, and
the district court found that Fine Foliage
succeeded in establishing a prima facie
case. First, it found that "the subject fern
was in good condition when loaded by the
plaintiff's employees into the reefer for
transportation by the defendant on the
morning of April 29, 1987." *Fine Foliage
of Florida, Inc. v. Bowman Transporta-*

---

1. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*tion, Inc.,* 698 F.Supp. 1566, 1573 (M.D.Fla. 1988). Second, the district court found that "the subject fern was ruined upon arrival in Savannah, although the total loss of the shipment was not declared until arrival and inspection in Tokyo." *Id.* Finally, it found that the "plaintiff had substantiated its damages attributed to the loss of the subject fern at $21,035.60." *Id.*

Bowman claims that Fine Foliage's testimony at trial was insufficient to establish a prima facie case against the carrier and that the district court erred in failing to grant Bowman's motion for involuntary dismissal under Fed.R.Civ.P. 41(b). As the trial judge's ruling on Fine Foliage's prima facie case was based on his findings of fact, we review his conclusions under the clearly erroneous standard.

■ Bowman argues that the court erred in finding that the ferns were initially in good condition, when the only evidence as to the condition of the ferns when they left Fine Foliage was a Department of Agriculture certificate which showed lack of insect infestation. It argues that prior decisions of this and other courts have required that the condition of the contents of a container be established by eyewitness or other direct reliable testimony. In support of that assertion, Bowman points to *Highlands Insurance Company v. Strachan Shipping Company,* 772 F.2d 1520 (11th Cir.1985); *Pillsbury Co. v. Illinois Central Gulf Railroad,* 687 F.2d 241 (8th Cir.1982); and *D.P. Apparel Corp. v. Roadway Express, Inc.,* 736 F.2d 1 (1st Cir.1984).

We find that Bowman's reliance on these cases is misplaced. *Highlands* involved a situation in which there was no proof, other than a bill of lading, that TV sets, reported stolen, had actually been placed in a sealed seagoing container. It stands only for the proposition that evidence "such as the testimony of an eyewitness to the loading of the container is necessary to confirm the contents." *Highlands,* 772 F.2d at 1521. Here, there is no dispute that the ferns were loaded into the container.

In *Pillsbury,* the court held that where goods are shipped under seal, a bill of lading does not establish a prima facie case for the shipper that the goods were in good order. Instead, the shipper must "present[ ] additional evidence sufficient to establish by preponderance of all the evidence the condition of the goods upon delivery." 687 F.2d at 244. The *Pillsbury* court relied on circumstantial evidence to find that the plaintiff had demonstrated that the cars, when loaded, were free of insect infestation. In *D.P. Apparel,* the court found that the plaintiff failed to establish a prima facie case by relying primarily on the bill of lading for the proposition that the goods were delivered to the carrier in good condition. 736 F.2d at 4.[2]

■ In the instant case, neither the plaintiff nor the trial judge relied on the bill of lading to establish delivery of the goods to Bowman in good condition. Instead, the trial court based its finding regarding the original condition of the ferns on "the approval of the fern by the Department of Agriculture; the testimony as to the care and temperature control of the fern after its harvest; and the fact that other fern, packaged in the identical manner and stored in the same cooler as the subject fern, arrived at overseas destinations in acceptable condition." *Fine Foliage,* 698 F.Supp. at 1573. We find no support for Bowman's assertion that a judge may not rely on circumstantial evidence to establish the original condition of goods when that evidence is substantial and reliable.[3] In light of the evidence in the in-

**2.** *See also National Transp., Inc. v. Inn Foods, Inc.,* 827 F.2d 351, 355 (8th Cir.1987) (shipper must offer evidence other than clean bill of lading to establish condition of the goods upon delivery).

**3.** Indeed, the evidence relied on in *Pillsbury* was similar to that presented in the instant case. Pillsbury produced evidence of its preloading inspection and cleaning procedures and also showed that a test car switched through the

defendant carrier's yard became infested while one switched to another carrier's yard did not. *Pillsbury,* 687 F.2d at 245. *See also, Frosty Land Foods v. Refrigerated Transport,* 613 F.2d 1344, 1347 (5th Cir.1980) (although plaintiff failed to introduce any specific evidence noting precisely condition of meat at time it was placed on trailer, evidence was sufficient to support finding that beef was delivered to carrier in good condition).

stant case, we find that the judge did not err in holding that Fine Foliage had established the first prong of its prima facie case.

■ Bowman further contends that the court erred in finding that the ferns arrived at their destination in a damaged condition. The court based this finding "upon the 0° Fahrenheit temperature setting in the container as evidenced by the temperature chart and the credible testimony regarding the consequent detriment to fern caused by freezing temperatures." *Id.* at 1573. Bowman argues that Fine Foliage did not establish the accuracy of the particular Ryan recorder used to record the temperature in the container. We note, however, that there was substantial evidence introduced at trial that the temperature setting on the container was at 0°: the Mitsui equipment interchange receipt lists a temperature setting of 0°, and the marine surveyor in Savannah found both that the temperature had been set at zero and that there was a layer of ice on the ferns. Fine Foliage also presented sufficient testimony to establish that ferns that are subjected to such temperatures for a period of hours cannot possibly remain unharmed. In sum, our review of the record indicates that there was ample evidence presented at trial from which the trial judge could conclude that the ferns were destroyed while in Bowman's possession and we cannot say that the judge erred in finding that Bowman established this prong of the prima facie case.

■ A trial judge's ruling on a motion for involuntary dismissal pursuant to 41(b) is reviewable for abuse of discretion. *Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir.1985). Because Fine Foliage established each prong of its prima facie case, the district judge did not abuse his discretion in failing to dismiss the case.[4]

### B. Defenses to a Prima Facie Case under the Carmack Amendment

Once a plaintiff has established a prima facie case under the Carmack Amendment,

the burden of proof shifts to the carrier to show that it was free from negligence and the damage was caused solely by "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Missouri Pacific R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964); *Frosty Land Foods*, 613 F.2d 1344, 1346–47 (5th Cir.1980).

■ The district court found that Bowman was negligent in failing to notice and correct the temperature setting on the reefer containing the ferns. It found that there was no reason that Davis should not have noted the incorrect temperature setting of the container prior to loading the ferns, particularly in light of Davis's knowledge of the correct temperature. In finding that Bowman failed to rebut Fine Foliage's prima facie case, the court relied on the fact that the 39° temperature was noted on the bill of lading signed by Davis. *See Fine Foliage*, 698 F.Supp. at 1573. It also took note of Bowman's course of dealing with Fine Foliage, Bowman's knowledge of the proper temperature, and Davis' knowledge that the cooling system had malfunctioned. *Id.* The court stressed that it would have been logical and reasonable for Davis, who had some knowledge of the time required for cooling a container, to check the temperature setting of the container prior to or during the loading of the ferns in order to determine whether the reefer had adequately pre-cooled. The court found that even if Davis was not able to adjust the temperature setting, he could have called the improper setting to the attention of one of the Fine Foliage employees. *Id.* at 1574. There is ample support in the testimony introduced at trial for the district court's finding of negligence. We also find no error in the district court's finding that even if Bowman was not negligent, it had not established any of the accepted defenses to Fine Foliage's prima facie case.

---

**4.** Bowman also contends that the suit should have been dismissed because Fine Foliage filed suit upon an incorrect bill of lading to which it was not a party. We find this contention without

merit. Although Fine Foliage mistakenly attached the ocean bill of lading issued by Mitsui to its complaint, it introduced the correct bill of lading at trial.

### III. Bowman's Protective Service Tariff

On appeal, Bowman does not argue that it was able to rebut Fine Foliage's prima facie case by setting forth one of the accepted explanations for product damage. Instead, Bowman claims that the court erred as a matter of law in concluding that its protective service tariff filed with the ICC was unenforceable and did not operate to relieve it of liability under the Carmack Amendment.

#### A. Item 810 of Bowman's Tariff

At the time of shipping, Bowman had filed a Container Tariff with the ICC, Item 810 of which stated as follows:

### PROTECTIVE SERVICE

Under the provisions of this tariff, BOWM will *NOT* accept shipments that require BOWM to provide refrigeration or other protective service. Shipments accepted by BOWM which are subject to temperature damage are accepted only at shipper's risk and responsibility.

Although Bowman relies on this tariff to argue its lack of liability for faulty refrigeration, it is unclear, in the first instance, whether the tariff applies to the shipment at issue in this case.

The shipping from DeLeon Springs to Savannah took place under two bills of lading. The district court found that Bowman's protective tariff was not incorporated into either of these documents. The first document, which covered the trip from DeLeon Springs to Jacksonville, is not a Bowman document and does not refer to Bowman's tariffs or Bowman's long-form bill of lading. The second document is a Bowman bill of lading, covering the Jacksonville to Savannah portion of the trip. Although portions of the bill are illegible, it does not appear to make reference to Bowman's tariffs or long-form bill of lading.

■ Bowman makes two arguments as to why Item 810 applies to the shipment of ferns at issue. First, it states that a tariff need not be communicated to a shipper to retain its full force and effect. It relies on *Southwestern Sugar & Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959) and *Missouri Pacific*, 377 U.S. 134, 84 S.Ct. 1142 for the proposition that a tariff duly filed with the ICC has the full force of federal statute. We agree with Bowman's assertion regarding the legal status of a tariff duly filed with the ICC. In the cases referred to by Bowman, however, the provisions of the tariff given effect were incorporated by reference in the bill of lading issued in connection with the transportation.[5] The question of whether a shipper must receive actual notice of a tariff brought into play by a bill of lading is different from the question of whether the tariff is incorporated into the bill of lading in the first place.

■ Anticipating the question of incorporation, Bowman's second argument is that its shipment is covered by the Uniform Straight Bill of Lading, which, it claims, applies to shipments for which a carrier fails to provide the shipper with a bill of lading. Bowman states that the Uniform Straight Bill of Lading provides that shipments are received subject to tariffs in effect on the date of issue of that bill. The difficulty with Bowman's reference to the Uniform Straight Bill of Lading is that this shipment was already covered by two bills of lading that constituted the contract of carriage between the parties. Thus, there is no reason that the Uniform Bill should come into play.

The district court, although apparently finding that the tariff was not incorporated, went on to examine the legal effect of a tariff provision purporting to limit liability of which the shipper was not given actual notice. Given the complete absence of any reference in the documents covering the shipment to a long form bill of lading or to any duly filed tariffs, this court also questions whether Item 810 of Bowman's tariff governs this shipment. We need not determine, however, whether Item 810 was properly incorporated, for even assuming that

---

**5.** *See S.W. Sugar & Molasses Co.*, 360 U.S. at 413–14, 79 S.Ct. at 1213; *Missouri Pacific*, 377 U.S. at 144, 84 S.Ct. at 1148 (Douglas, J. dissenting).

Item 810 was made part of the bills of lading, the extent to which this tariff operated to relieve Bowman of liability remains to be decided.

In finding that Bowman's tariff did not relieve it of liability, the district court first noted that "[n]onmandatory tariff provisions filed by carriers, such as Item 810, have been recognized by the Eleventh Circuit to be ineffective against shippers, when actual notice is not given the shipper that the nonmandatory tariff arguably conflicts with protections afforded the shipper under federal statutes." *Fine Foliage*, 698 F.Supp. at 1575. In so holding, the district court correctly interpreted Eleventh Circuit law. *See State Establishment for Agricultural Products Trading v. M/V Wesermunde*, 838 F.2d 1576 (11th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 273, 102 L.Ed.2d 262 (1988); *Swift Textiles, Inc. v. Watkins Motor Lines, Inc.*, 799 F.2d 697 (11th Cir.1986), *cert. denied*, 480 U.S. 935, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987); *Allstate Insurance Co. v. International Shipping Corp.*, 703 F.2d 497 (11th Cir. 1983). It is clear in this case that neither Wilk nor Fine Foliage was informed of the existence of Item 810 of Bowman's tariff so as to relieve the carrier from providing temperature control.

On appeal, Bowman first argues that the district court erred in finding that its protective service was *nonmandatory*. We note that in *Swift*, this court used the term "nonmandatory" as a shorthand means of identifying "insert[ions] into tariffs and long form bills of lading various limitations of liability and other burdensome provisions—not required by law to be there." *Swift*, 799 F.2d at 701 & n. 3. Item 810 easily fits within this definition, and the district court correctly identified it as a nonmandatory tariff.[6]

Bowman further argues that Item 810 does not conflict with the provisions of the Carmack Amendment, as that Amendment's prohibition on limitations of liability does not encompass protective service tariffs. Under *Swift*, actual notice is only required when limitations contained in a tariff conflict with the Carmack Amendment. 799 F.2d at 697. We agree with the district court that Item 810 conflicts with the Carmack Amendment and explain our reasons below.

## B. The Interaction of the Carmack Amendment and Bowman's Protective Service Tariff

■ Section (c)(1) of the Carmack Amendment specifically limits a carrier's ability to exempt itself from liability under Section (a)(1) of the Amendment. It states that:

A common carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection. A limitation of liability or of the amount of recovery or representation or agreement in a receipt, bill of lading, contract, rule or tariff filed with the Commission in violation of this section is void.

The only situation in which a carrier may limit its liability is under the released value provision of 49 U.S.C. § 10730, which states that:

(b)(1) [A] motor common carrier providing transportation ... may ... establish rates for the transportation of property (other than household goods) under which the liability of the carrier or freight forwarder for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

The district court found that the Carmack Amendment unequivocally states that any limitation of liability by a carrier in a tariff filed with the ICC in violation of the Amendment is void. It further found that the only way a carrier can limit its liability is by the written declaration permitted by Section 10730 of the Carmack Amendment.

---

6.  *See also Marvirazon Compania Naviera, S.A. v. H.J. Baker & Brothers, Inc.*, 674 F.2d 364, 366 (5th Cir.1982) (tariffs that are not related to rates or charges are not required by law to be in the tariff).

The district court held that because Bowman did not employ the statutory procedure for limiting its liability as stated in Section 10730, its "tariff must succumb to the protection afforded [Fine Foliage] under the Amendment." *Fine Foliage*, 698 F.Supp. at 1576.

Bowman first argues that Section 10730's exception to liability under the Carmack Amendment has no bearing on a protective service tariff such as Item 810. It argues that the trial court failed to understand that Bowman's tariff 810 was not an attempt to come within the Section 10730 exception and that the court thus erred in finding Bowman at fault for failing to follow Section 10730's requirements.

We agree with Bowman that this case does not involve an attempt by a shipper to reduce its liability by agreeing with the carrier upon lower shipping rates in exchange for a lower level of liability, and that Section 10730 of the amendment does not come into play. Our reading of the trial court's opinion, however, convinces us that it also understood that this was not a "released value" case. The district court examined Section 10730 only to ascertain whether that section would provide a basis for Bowman to limit its liability under the Amendment. It did not confuse Bowman's protective service tariff with cases falling under Section 10730.

The fact that provisions for reduced value *must* be communicated to the shipper does not mean that other provisions limiting liability are in full force absent communication. Indeed, the plain language of the Carmack Amendment states that "a limitation of liability or of the amount of recovery in a ... tariff filed with Commission in violation of this section is void." This suggests that the *only* exception to carrier liability is through a negotiated released value provision. *See W.C. Smith v. Yellow Freight Systems, Inc.*, 596 F.Supp. 515, 516 (E.D.Pa.1983) (Carmack Amendment imposes absolute liability, but permits carriers to limit liability pursuant to section 10730). It does not mean that Bowman's tariff was effective to release it from liability. In fact, the language of the Amendment leads

us to conclude that Bowman's protective service tariff would be void whether or not it was communicated to the shipper.

In arguing that its protective service tariff should be given effect, Bowman points to several cases in which carriers with protective service tariffs have been found not liable for the freezing or spoilage of a shipper's goods. *See, e.g., American Writing Ink Co. v. New York, N.H. & H.R.*, 80 F.Supp. 694 (D.Mass.1948); *Jackson & Perkins Co. v. Mushroom Trans. Co.*, 351 Pa. 583, 41 A.2d 635 (1945). In these cases, however, the shippers either did not request any sort of protective service, *see American Writing Ink*, 80 F.Supp. at 694, or the defendants operated no heated trucks and had no heated terminal stations. *See Jackson & Perkins*, 41 A.2d at 638.

Bowman relies on the former Fifth Circuit's opinion in *Trautmann Bros. Co. v. Missouri Pacific Railroad Co.*, 312 F.2d 102 (5th Cir.1962) for the proposition that liability of a carrier can only be sustained for failure to abide by the protective tariff. In *Trautmann*, the court held that the carrier's protective service tariffs served "to limit the liability of a carrier transporting perishable goods to liability for negligent failure reasonably to carry out instructions given by the shipper." *Id.* at 104. The court stated that nothing in the Carmack Amendment precludes a carrier from limiting its liability in that matter, but that "[t]he section provides simply that a carrier cannot limit its liability for damages *caused by the carrier." Id.* (emphasis in original). We fail to see how *Trautmann* supports Bowman's argument. Here, the bill of lading clearly indicated that the shipment was to be shipped at 39° Fahrenheit. Had Bowman checked the temperature, it would have easily been able to comply with those instructions. There is no doubt here that the carrier failed to carry out the shipper's instructions.

■ As a final defense, Bowman argues that Item 810 has the effect of federal law and cannot be deviated from (i.e. protective service cannot be provided) without violating the Elkins Act (former title 49 U.S.C. § 41 now recorded as 49 U.S.C.

§§ 11902, 11903, 11915 and 11916). The Elkins Act provides criminal penalties for carriers who extend preferential treatment to certain customers in violation of a tariff. Bowman argues that the provisions in its tariff *required* it to ignore Fine Foliage's request for protective service as set out in the bill of lading.[7]

The argument put forth by Bowman is identical to that urged by the carrier in *Johnson Motor Transport v. United States,* 149 F.Supp. 175, 137 Ct.Cl. 892 (1957). That case involved a shipment of meat that was not transported under refrigerated conditions as directed by the bills of lading. The carrier's tariff provided that it was not obligated to provide protective service, and the carrier argued "that it would be unlawful for a common carrier in interstate commerce to render for one shipper any service not provided for in the carrier's tariff and made available to all shippers." *Id.* 149 F.Supp. at 178. The court found that:

> In view of the carriers' privilege of refusal, it would seem unfair to permit them, after having accepted the shipments and agreed to transport the meat in refrigerator trucks, to avoid liability for breach of contract on the ground that the defendant should not have placed any reliance on their promise because their commitment to transport the meat in refrigerator trucks was beyond the scope of their tariff provisions.

*Id.* at 179. Bowman had the option to inform Wilk that it did not provide refrigerated service and that it therefore would be unable to transport the fern. Once it did accept the shipment, we cannot believe that the Elkins Act prohibited Bowman from setting a temperature gauge on a refrigerated container at the correct setting instead of leaving it at a setting approximately forty degrees colder than it should have been. Such an action is not the sort of preferential treatment to which the Elkins Act is directed.

In addition, the mere fact that Bowman's tariff was on file with the ICC does not make that tariff operative. Case law makes clear that a tariff filed in violation of the Carmack Amendment is void. Bowman could not be held liable under the Elkins Act for failing to comply with a tariff that is void and of no effect. In *Boston and Maine Railroad v. Piper,* 246 U.S. 439, 38 S.Ct. 354, 62 L.Ed. 820 (1918), the Supreme Court examined the effect of a provision in a bill of lading that limited a carrier's liability from unusual delay and detention caused by the carrier's negligence. The court stated that:

> While this provision was in the bill of lading, the form of which was filed with the railroad company's tariffs with the Interstate Commerce Commission, it gains nothing from that fact. The legal conditions and limitations in the carrier's bill of lading duly filed with the Commission are binding until changed by that body; but not so of conditions and limitations which are, as is this one, illegal, and consequently void.

*Id.* at 445, 38 S.Ct. at 355 (citations omitted); *see also Jones v. Yellow Freight Systems,* 656 F.Supp. 550, 554 (M.D.Ga.1987) (existence of a tariff not in itself sufficient to limit liability); *Watson Bros. Transp. Co. v. Feinberg Kosher Sausage Co.,* 193 F.2d 283, 286 (8th Cir.1951) (if clause of tariff is construed to release plaintiff from duty to exercise reasonable care, then proviso is void).

In sum, we agree with the district court that Bowman's protective service tariff is nonmandatory and that actual notice of the tariff provision must be given to the shipper. We further find that the tariff runs contrary to the protection afforded under the Carmack Amendment in that it attempts to limit Bowman's liability for dam-

---

7. In support of this proposition, Bowman cites to *Northern Wisconsin Produce Co. v. Chicago & N.W. Ry.,* 203 Wis. 549, 234 N.W. 726 (1931) in which the Wisconsin court refused to hold a carrier liable for damage to eggs which froze during transport due to cold weather where the carrier's tariffs did not provide for protective service. To the extent that the case stands for the proposition that the carrier cannot be held liable because it would have been illegal for it to furnish service not provided for in its tariff, we disagree with the holding of the Wisconsin court.

age to the shipper's goods. We thus agree with the district court that even if the tariff were communicated to the shipper, it would be void under the Carmack Amendment.

In finding that Bowman is liable under the Carmack Amendment, we do not hold that Bowman is required to provide refrigerated service in contravention of a tariff that prohibits it from transporting refrigerated containers. We hold that the Carmack Amendment prohibits a carrier from relying on a protective service tariff to exempt itself from liability for negligent use of a refrigerated container once it accepts goods for shipment that require refrigeration.

For the foregoing reasons, the opinion of the district court is AFFIRMED.