[Cite as *Downtime Rebuild, L.L.C. v. Trinity Logistics, Inc.*, 2019-Ohio-1869.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| DOWNTIME REBUILD, LLC , | : | APPEAL NO. C-180157 |
| Plaintiff-Appellee, | | TRIAL NO. A-1601504 |
| | : | *O P I N I O N.* |
| vs. | | |
| TRINITY LOGISTICS, INC., | : | |
| and | | |
| | : | |
| DDT, INC., | | |
| Defendants-Appellants. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part and Reversed in Part, and Judgment Entered

Date of Judgment Entry on Appeal:  May 15, 2019

*Rebold Larkin Murray, LLC, Andrew J. Ferguson,* and *Kyle D. Murray,* for Plaintiff-Appellee,

*Bruns, Connell, Vollmar & Armstrong, LLC,* and *Kevin C. Connell,* for Defendants-Appellants Trinity Logistics, Inc., and DDT, Inc.,

*Faulkner & Tepe, LLP, John C. Scott,* and *Tracy Schwetschenau,* for Defendant-Apellant Trinity Logistics, Inc.

**CROUSE, Judge.**

{¶1} Defendants-appellants Trinity Logistics, Inc., ("Trinity") and DDT, Inc., ("DDT") have appealed the decision of the Court of Common Pleas finding them liable under the Carmack Amendment for damage to two CNC computer machines purchased by plaintiff-appellee Downtime Rebuild, Inc., ("Downtime").

{¶2} In two assignments of error, appellants argue that the trial court erred when it found that the only evidence in the record was that the machines were fully operational when picked up by DDT for shipping, and that the trial court erred when it rendered a verdict for Downtime in the amount of $140,000.

*Factual Background*

{¶3} Downtime specializes in refurbishing and reselling CNC machines, which are large machines typically used for cutting metal for automotive parts. In April 2015, Neil Corbett, co-owner of Downtime, went to Nebraska to inspect two CNC machines he was interested in buying from Garner Industries, which was selling the machines in anticipation of upgrading to newer CNC machines. Corbett spent the day inspecting the machines—he tested them under power and determined that they were running well and in good condition. Corbett did not buy the machines at that time, because he thought the price was too high.

{¶4} Roughly three months later, Corbett was contacted by a broker from K.D. Capital, which had been hired by Garner Industries to sell the CNC machines. K.D. Capital sent Corbett a video which showed the two machines under power and running properly. Corbett testified at trial that he received the video in December, but that is not possible since the evidence shows that he bought the machines in

October. Regardless, the video was not date-stamped, and Corbett admitted that he had no idea when it was actually shot. Using the serial numbers, Corbett confirmed that the machines in the video were the same two machines he had inspected previously. Corbett asked K.D. Capital if the machines were still under power, and he was informed they had been disconnected from power in preparation for shipment to California.

{¶5} Downtime purchased both machines "as-is" from K.D. Capital on October 5, 2015, for $140,000. Corbett admitted at trial that he did not know the manner in which the machines were stored at Garner Industries between April and October 2015.

{¶6} Downtime hired Trinity to transport the machines from Nebraska to Ohio. Trinity in turn hired DDT, a trucking company, to complete the actual transportation. To ensure the machines were not damaged during shipment, Downtime sent specific shipment instructions to Trinity, requesting that the machines be fully "tarped" during transportation, that the straps not be placed over the tops of the machines, and that pictures of the machines be sent to Corbett once they were loaded onto DDT's truck.

{¶7} The machines were picked up from Garner Industries by Larry Adams, the truck driver for DDT, on October 12, 2015. Adams did not notice any damage to the machines as they were loaded onto his trailer, but he did not inspect the interior of the machines. Adams testified that he never received the shipment instructions Downtime provided Trinity, but that he knew from experience the machines needed to be tarped. Nevertheless, he failed to fully tarp the machines or send pictures to

Corbett once the machines were loaded, and the straps were placed over top of the machines, all contrary to Downtime's instructions.

{¶8}   When Corbett pulled into the parking lot of Downtime on October 15, he saw Adams's truck and immediately noticed that the machines were not properly tarped or strapped.  The straps were placed over the tops of the machines and significant portions of the machines were not covered by tarps.  Corbett also noticed that certain components were missing and that a piece of skirting was missing from one of the machines.

{¶9}   The CNC machines come with "chip conveyors," components separate from the machines themselves, which were packaged separately for purposes of transportation.  Adams removed the straps on the chip conveyors in anticipation of unloading the equipment.  Corbett informed Adams that he would have to back the truck into the building for off-loading.  When Adams started to back the truck into the building, the unstrapped chip conveyors fell off the truck and were damaged. The CNC machines themselves were later unloaded in Downtime's warehouse without incident.

{¶10} Once Corbett put the CNC machines under power to test them, he heard the machines making troublesome noises.  He took the machines apart and discovered that the internal components were covered in rust.  He concluded that the machines were ruined and worthless even as scrap metal because the cost to turn them into scrap would nullify any proceeds.  Downtime submitted claims to Trinity for the missing components, the damage to the chip conveyors, and for the CNC machines themselves.

*Liability Under The Carmack Amendment*

{¶11} Appellants argue that Downtime failed to prove that the CNC machines were delivered to DDT in good condition, and so has failed to establish a prima facie case of carrier liability under the Carmack Amendment.

{¶12} The standard of review following a civil bench trial is whether the trial court's judgment is against the manifest weight of the evidence as supported by competent, credible evidence. *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, 17. Under a manifest-weight-of-the-evidence review, "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Id.* at ¶ 21.

{¶13} When reviewing a trial court's decision under a manifest-weight-of-the-evidence standard, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether the trial court "clearly lost its way and created a manifest miscarriage of justice." *Fischoff v. Hamilton,* 1st Dist. Hamilton No. C-120200, 2012-Ohio-4785, ¶ 11.

{¶14} Liability of a carrier for damage to goods during an interstate shipment is a matter of federal law controlled by the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. 14706. *Missouri P.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964). In order to establish a prima facie case of carrier liability under the Carmack Amendment, a plaintiff must show (1) delivery of the goods to the carrier in good condition, (2) arrival in damaged condition, and (3) the amount of damages. *Id.* at 138. Once a prima facie case is established, the burden shifts to the carrier to show that it was not negligent and that

the damage was due to an excepted cause which would relieve the carrier of liability. *Id.* at 137.

{¶15} The first prong, that the machines were delivered to DDT in good condition, is the primary issue in this case. Appellants contend that Downtime did not present any evidence to prove that the CNC machines were delivered to DDT in good condition. They argue that this case is similar to *Albert v. United Parcel Serv. of Am., Inc.,* 8th Dist. Cuyahoga No. 14-CVF-00784, 2016-Ohio-1541.

{¶16} In *Albert,* the plaintiff shipped a glass sculpture via common carrier, but presented no evidence of the condition of the sculpture from the time it was packaged and crated to the time it was dropped off at the carrier 84 days later. *Id.* at ¶ 9. The plaintiff's husband packaged the sculpture and sealed it in a crate before transporting it to his mother's house for storage. *Id.* at ¶ 2. It remained there for 84 days before plaintiff's brother-in-law transported the sculpture, still sealed in the crate, to the UPS store for shipment. *Id.* At the UPS store, neither the brother-in-law nor the store employee opened the crate to check on the condition of the sculpture. *Id.* The sculpture was shipped by UPS and arrived damaged to plaintiff. *Id.* The Eighth District found that where the condition of the sculpture was "simply unknown" at the time the sculpture was delivered from the shipper to the carrier, the plaintiff had not met the first prong of her prima facie case under the Carmack test. *Id.* at ¶ 9.

{¶17} Downtime argues that appellants' reliance on *Albert* is flawed and that this case is more like *Fine Foliage of Florida Inc. v. Bowman Transp. Inc.,* 901 F.2d 1034 (11th Cir.1990). In *Fine Foliage,* the plaintiff recovered under the Carmack Amendment for damages to ferns which he shipped via carrier. *Id.* at 1038. The plaintiff established the first prong of the prima facie case through circumstantial

evidence which tended to show that the ferns were in good condition at the time of delivery to the carrier. *Id.* The Eleventh Circuit found that such reliance on circumstantial evidence was proper when the evidence was "substantial and reliable." *Id.*

{¶18} The ferns were driven by truck from Fine Foliage's nursery to seaport for transportation overseas via cargo ship. *Id.* at 1035. The carrier (the trucking company) was given specific instructions for the temperature at which to transport the ferns. *Id.* at 1036. The carrier transported the ferns at a temperature far colder than appropriate. *Id.* A notation of the carrier's negligence was made by the cargo ship before the cargo ship took custody of the ferns and shipped them overseas. *Id.* Upon arrival at their destination, the ferns were totally destroyed due to transportation at an improper temperature. *Id.*

{¶19} Absent direct evidence of the ferns' condition prior to delivery to the carrier, the court relied on several pieces of circumstantial evidence: (1) the ferns were approved by the Department of Agriculture for shipment prior to loading, (2) the ferns were stored under the proper temperature at Fine Foliage after their harvest, and (3) other ferns packaged identically, transported to sea port in different trucks, and stored in the same cooler aboard the cargo ship as the subject ferns, arrived overseas in good condition. *Id.* at 1038. The court found that such evidence, though circumstantial, was enough to satisfy plaintiff's burden under the first prong for prima facie liability. *Id.* at 1038-1039.

{¶20} In *Fine Foliage,* the plaintiff could account for the storage of the ferns prior to shipment. *Id.* at 1038. Downtime cannot. The closest Downtime comes is an undated video of the machines running properly received by Corbett "three

7

months or so" after the April 2015 inspection. Even if the video was sent to Corbett on the same day it was shot, the video still shows the condition of the machines roughly two months before the ship date.

{¶21} It is acceptable for the trial court to draw reasonable inferences from the circumstantial evidence presented. *Allied Tube & Conduit Corp. v. S. Pac. Transp. Co.,* 211 F.3d 367, 371 (7th Cir.2000). In *Allied,* the plaintiff presented testimony regarding standard procedures used to ensure delivery of goods to carriers in good condition. *Id.* The court reasonably inferred that the standard procedures were followed during the shipment in controversy. *Id.* Considered along with evidence that an intermediate carrier did not note any issues with the condition of the goods, and the bill of lading noted the goods in good condition upon delivery to the carrier, the court determined that plaintiff had satisfied the first prong of its prima facie case. *Id.* Similarly, the Sixth Circuit has called the prima facie case a "very low threshold." *CNA Ins. Co. v. Hyundai Merchant Marine Co.*, 747 F.3d 339, 353 (6th Cir.2014).

{¶22} Nevertheless, Downtime's evidence fails to satisfy this low threshold. There is minimal evidence that the machines were transferred to DDT in good condition. Such evidence is limited to: (1) Corbett's testimony that in April 2015 he fully inspected the machines and found them operational, and (2) the video sent to Corbett which showed the machines in working order. There is no other evidence in the record regarding how the machines were stored or their condition between April and October 2015.

{¶23} Furthermore, there was no testimony regarding the standard procedures followed by Garner Industries or K.D. Capital in storing their CNC

machines. At trial, Adams testified that he could not remember if at the time he received delivery of the machines they were being stored indoors or outdoors.

{¶24} At the time of shipment, the machines were disconnected from power and were being prepared for shipment to California. We do not know if the machines were moved or stored differently as a result. When the machines were loaded onto DDT's truck, Adams did not notice any damage to the machines, but he did not inspect the interior of the machines. Adams is not an expert in CNC machines and should not have been expected to inspect the interior components of a closed machine. Even to Corbett, an expert on CNC machines, the extent of the damage was not known until he powered the machines up, heard the sounds they produced, and then took them apart and discovered all of the rust inside.

{¶25} The trial court said in its order that absent evidence presented by the appellants, the court would have to guess as to the condition of the machines prior to shipment. This is precisely the point addressed by the court in *Albert* when it held that it was "simply unknown" what condition the sculpture was in when it was delivered to the carrier. *Albert,* 8th Dist. Cuyahoga No. 14-CVF-00784, 2016-Ohio-1541, at ¶ 9. Downtime's evidence that the machines were in good condition is too remote from the date of shipment; there are significant gaps between Corbett's inspection in April 2015, the video, and the loading of the machines onto DDT's trailer on October 12, 2015. It is simply unknown what condition the machines were in when they were loaded onto DDT's trailer on October 12, 2015.

{¶26} Even viewing every reasonable presumption in favor of the judgment and the findings of fact, it was unreasonable for the trial court to find that Corbett's testimony was sufficient to meet Downtime's burden of establishing the first prong of

the prima facie case of carrier liability under the Carmack Amendment. The trial court clearly lost its way and created a manifest miscarriage of justice in holding appellants liable for the full cost of the CNC machines. Appellants' first assignment of error is sustained.

### *Components of the CNC Machines*

{¶27} We must now decide whether appellants are liable for the missing components or the damage to the chip conveyors which fell off of Adams's trailer.

{¶28} In their second assignment of error, appellants contend that in the event this court sustains the trial court's conclusion that Downtime established a prima facie case of carrier liability, it must find the trial court erred in rendering a verdict for Downtime in the amount of $140,000, the amount Downtime paid for the CNC machines. Instead, appellants argue, Downtime's damages are limited to the $35,332 it listed on its amended claim form filed with Trinity on November 20, 2015.

{¶29} In their brief, appellants state:

[T]here is no dispute that the chip conveyors, which were packaged separately, were damaged when they fell from the truck. The value of those items – specified on the amended Claim Form as $35,332 – is the appropriate measure of Downtime's damages, if any.

Further, during oral argument, counsel for appellants conceded that the trial judge's findings regarding the damage to the chip conveyors were not against the manifest weight of the evidence, and that appellants are liable for the $35,332 claimed on the amended claim form. Thus, appellants concede they are liable for the chip conveyors under the Carmack Amendment.

{¶30}  It is undisputed that the machines arrived at Downtime without some of the associated components, including various covers and cables.  It is also undisputed that Adams unstrapped the chip conveyors before attempting to back the trailer into Downtime's building.  As Adams backed up, the chip conveyors fell off of the trailer and were damaged.

{¶31}  The trial court found that the negligence of Adams caused the chip conveyors to fall off of the truck and sustain severe damage.  On November 20, 2015, Downtime filed an amended claim form with Trinity in which it claimed a total cost of $35,332 for replacement of the missing components and the damage to the chip conveyors.  Downtime determined this dollar amount after consulting with Makino, the manufacturer of the machines, and researching replacement parts online.

{¶32}  We find no issues with the trial court's determination that appellants are liable for the missing components and the damage to the chip conveyors.  Downtime's consultation with Makino and its research efforts are sufficient to establish that the actual value of the lost components and the damage to the chip conveyors was $35,332, as claimed in the amended claim form.

{¶33}  We sustain appellants' second assignment of error that the trial court erred in awarding damages to Downtime in the amount of $140,000.  The proper measure of damages is $35,332.

{¶34}  While the general rule is that judgment will not be rendered by the court of appeals,

> where the pleadings and evidence all unequivocally show that a party is entitled to judgment, especially where the right is admitted in a

pleading, the party in whose favor such admissions are made, must be

considered to be entitled to judgment * * *.

*Meyer v. Dutro*, 102 Ohio App. 195, 199, 139 N.E.2d 476 (1st Dist.1956).  Therefore,

we find that remand to the trial court is not necessary, and it is proper for this court

to enter judgment.

### Conclusion

{¶35}  The trial court erred in finding that Downtime had proven their prima

facie case of carrier liability and awarding damages in the amount of $140,000.  The

trial court did not err in finding appellants liable for the missing components and the

damage to the chip conveyors.  We reverse in part the decision of the trial court and

modify the award of $140,000 to $35,332.  We affirm the trial court's judgment in

part as modified.

Judgment accordingly.

**BERGERON, P.J.,** and **WINKLER, J.,** concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.