**MITSUI & CO. (U. S. A.), INC.,**
**Appellant,**

v.

**RAMSEY TRUCK LINES, INC.,**
**Appellee.**

**No. 1543.**

Court of Civil Appeals of Texas,
Houston (14th Dist.).

June 8, 1977.

Rehearing Denied July 27, 1977.

Jan T. Steinberg, Robert A. Feltner, Houston, for appellant.

Victor F. Branch, Bettye J. Lambert, Houston, for appellee.

ON MOTION FOR REHEARING

COULSON, Justice.

Our opinion issued on June 8, 1977, is withdrawn, and the following opinion, is-

sued subsequently to appellant's motion for rehearing, is substituted therefor.

Mitsui & Co. (U.S.A.), Inc. (Mitsui) sued Ramsey Truck Lines, Inc. (Ramsey) for damages to steel tubes. A nonjury trial resulted in a take-nothing judgment against Mitsui. We affirm.

Mitsui sold to Hurricane Steel Industries Company (Hurricane) 390 lifts of steel tubes to be delivered "Ex-dock Houston." Mitsui shipped the steel tubes "freight prepaid" from Kobe, Japan to Houston on the ship *Izumi Maru* owned by the steamship company Nippon Yusen Kaisha (N.Y.K.). The ship arrived at the dock in Houston on April 3, 1972.

Hurricane retained Ramsey to transport the steel tubes from the ship to Hurricane's yard. Ramsey is a common carrier operating under a special motor carrier permit issued by the Texas Railroad Commission. The *Izumi Maru* discharged the steel tubes directly from the ship onto Ramsey's trucks on April 3, 4, and 5 and departed. Ramsey transported 24 lifts directly from the dock to Hurricane's yard. It carried the remaining lifts to its agent, Port Warehouse Service (Ramsey's yard), where the lifts were unloaded and stacked. Ramsey completed delivery of the steel tubes to Hurricane's yard on or about April 15.

The steamship clerk who inspected the cargo while still in the hold of the ship notified Hurricane that the tubes had been damaged in transit. Upon learning of the damage, Hurricane engaged David H. McCluskey, a marine surveyor, to determine the amount of the loss and to seek agreement as to the disposition of the loss. At the request of McCluskey, Hurricane gave written "notice of survey" to be held April 18 to Mitsui and to the agent for the ship *Izumi Maru*. Hurricane, Mitsui, and the *Izumi Maru*, through their respective agents and representatives, participated in the survey. Ramsey was not notified of the survey, did not know of the survey in advance, and did not participate in the survey. Ramsey properly objected to the introduction into evidence of the damage report based on this survey, because the report was hearsay as to Ramsey. *Compagnie De Navigation, Etc. v. Mondial United Corp.,* 316 F.2d 163, 170 (5th Cir. 1963).

The survey of the shipment of steel tubes was made in Hurricane's yard. The surveyors agreed upon a process of examination. Random sample lifts were selected as representative of the whole shipment, each sample lift was opened and each tube in the sample was examined for damage, and thereafter a percentage of damage was agreed upon by the surveyors and that percentage was applied to the whole shipment. The total tubes determined to have been damaged pursuant to the formula were discounted 50 percent from the invoice price, and a factor of $5.00 for each of the 390 lifts was allowed for opening, removing and replacing damaged tubes, and restrapping the lifts. Based upon the surveyors' conclusions, Mitsui allowed Hurricane a credit adjustment of $9,481.57 on its invoice, and all matters between Hurricane and Mitsui were compromised.

On June 28, 1973, Mitsui sued N.Y.K. and Ramsey for $10,000.00 for damage to the steel tubes and $3,000.00 for attorney's fees. Prior to trial, Mitsui and N.Y.K. settled and an order of dismissal with prejudice was entered as to N.Y.K.

The case against Ramsey was tried on Mitsui's original petition. At the close of Mitsui's evidence and after Mitsui rested, the court granted Ramsey's motion for judgment.

Upon granting Ramsey's motion, the judge indicated that if there was any idea that Ramsey was involved in the damages, Ramsey should have been invited to join the survey. The court further indicated that since McCluskey was concerned only with the total damages, McCluskey could not segregate the damages between the *Izumi Maru* and Ramsey, nor could the court determine the subrogated damage to Mitsui. In addition to the recorded comments of the judge, separate findings of fact and conclusions of law were filed.

The appellant asserts 12 points of error attacking specific findings of fact by the

trial court or attacking the refusal of the trial court to make requested findings of fact and challenging the court's conclusions of law.

A review of the evidence reveals that it is impossible to determine what parties caused what damage to the cargo. Therefore, the party with the burden of proof to apportion the damages cannot prevail.

Mitsui contends that Ramsey is subject to the legal presumption that when a consignor shows that the shipment was in good condition when delivered to the carrier and in a damaged condition when delivered to the consignee, the carrier is presumed to have caused the damage and has the burden to prove that he is not liable for all of the damage to the cargo.

■ Appellant relies upon *Missouri Pac. R. R. v. Elmore & Stahl,* 368 S.W.2d 99 (Tex.Sup.1963), aff'd, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964), in which the Texas Supreme Court held that after the shipper had made a prima facie case of carrier liability by showing that the shipment was in good condition when delivered to the carrier at place of origin and in a damaged condition when delivered by the carrier at destination, the carrier could not exonerate itself by showing that all transportation services were performed without negligence; the carrier had to go further and establish that the damage was caused solely by an act of God, the public enemy, the fault of the shipper, or the inherent nature of the goods. 368 S.W.2d at 101. We hold that since Mitsui failed to prove that the shipment was in good condition when delivered to Ramsey, there is no presumption that Ramsey caused the damage.

The steel tubes were made out of soft steel, which was very susceptible to damage in transit. Each lift consisted of numerous tubes bound in a hexagonal bundle by steel straps. With the exception of the ends of the tubes, only the exterior tubes in the bundles could be inspected without removing the straps. Only the sample lifts selected by the surveyors were examined in this fashion.

The receiving agent for Mitsui, the steamship clerk who noted the damage in stow, Hurricane's purchasing manager, and McCluskey testified at the trial. McCluskey was the only expert witness to testify. McCluskey testified that he "was retained by Hurricane Steel for the purpose of determining the total amount of damages and at that point we didn't care who did it, we wanted Mitsui to pay for all of it . . ." He also testified that no one knew how many pieces of pipe were damaged before the load was discharged from the ship; he did not pay much attention to what percentage of the damage was attributable to rough seas; the unloading process from the ship frequently causes damage; and he did not know how much forklift damage was done in loading and unloading the ship, or how much sling damage was done by the stevedores.

When the shipment was examined at Hurricane's yard, tubes on the interior of the bundles were dented, "white rusted," corroded, gouged and scraped. Exterior tubes were bent, gouged and dented. McCluskey was able to segregate some of the damage. He testified that the large tubes were probably bent by the stevedores; there was evidence of damage from the cargo shifting which should be assessed against the ship; there was evidence of factory defects and some denting of tubes before the tubes were bundled; evidence of sling damage probably done during discharge from the ship; and considerable damage from moving the tubing with forklifts. He testified that dunnage is often used by shippers and carriers to prevent forklift damage. No witnesses could recall whether there was dunnage separating the lifts in the hold of the ship. Ramsey did not use dunnage on the load of tubing it carried directly to Hurricane's yard, but was instructed by Hurricane to use dunnage on subsequent loads. There was some dunnage used when the lifts were stored at Ramsey's yard. Ramsey used forklifts to load the tubing at its yard, and Hurricane's employees used forklifts to unload the tubing at its yard. There was evidence of damage done in both the loading process at

Ramsey's yard and the unloading process at Hurricane's yard.

Hurricane's purchasing manager testified that he did not know of any damage done by any particular handler, but he did see Ramsey damage one load at Ramsey's yard. The steamship clerk testified that he did not see any damage inflicted by Ramsey when the cargo was discharged from the ship. Sometimes forklifts are used to move cargo around in the hold of a ship, but the clerk could not recall whether a forklift was used in this particular instance to put the tubing into the slings which were used to hoist the tubes out of the hold. There was evidence of damage by steel slings, but the clerk could not recall whether steel slings were used on this shipment. He testified that the only way to assess the true damage is to take the straps off of the bundles at the time of discharge, but that this was not done in this case nor is it done in the ordinary course of business.

McCluskey first saw the shipment of tubing at Ramsey's yard. Prior to that examination, the tubing had been handled at the factory, was loaded onto the ship in Japan, possibly encountered rough seas in transit, was discharged from the ship by stevedores, and was transported by Ramsey to its yard. No examination of the interior tubes was made until the shipment was at Hurricane's yard. Pictures taken at Ramsey's yard showed that some bundles had been broken open, probably due to rough handling, but McCluskey testified that there was no way to determine who broke the bundles. McCluskey testified that his examination of the shipment revealed that it had factory defects, forklift damage, bent tubing, and end damage before it was ever in Ramsey's possession.

The printed dock receipt forms signed by Ramsey's drivers contain a statement that the shipment was "received in good order and condition." The steamship clerk made notations on the receipts of the damage he could ascertain by examining the exterior of the bundles. As stated earlier, there was considerable damage which could be discovered only by opening the bundles. To this extent, the lifts of tubing were analogous to goods shipped in a sealed container.

■ We agree with appellant that if the tubes were in good condition when received by Ramsey, it was Ramsey's burden to apportion the damages. *Thompson v. Bob Tankersley Produce Co.*, 289 S.W.2d 840, 842 (Tex.Civ.App.—San Antonio 1956, writ ref'd n. r. e.). However, no presumption exists that the tubes were in good condition when delivered to the carrier. *Strickland Transp. Co. v. Cummins Supply Co.*, 488 S.W.2d 181, 183 (Tex.Civ.App.—Fort Worth 1972, no writ); *Yeckes-Eichenbaum, Inc. v. Texas Mexican Ry.*, 263 F.2d 791, 793 (5th Cir. 1959).

■ In order for a consignee or shipper to recover from a motor carrier for concealed damage, there must be proof that the shipment was in good condition when accepted by the motor carrier. *Strickland Transp. Co. v. Cummins Supply Co.*, 488 S.W.2d at 183. *Cf. T. I. M. E.–DC, Inc. v. Southwestern Historical Wax Museum Corp.*, 528 S.W.2d 901, 903 (Tex.Civ.App.—Waco 1975, no writ). Receipt in apparent good order by the carrier, coupled with the inability to ascertain defects by visual inspection, does not preclude a holding that a commodity was not in good condition when received by the carrier. *Thompson v. Bob Tankersley Produce Co.*, 289 S.W.2d at 841. The printed statement on the dock receipts that the tubes were in good order and condition merely suffices to establish prima facie the condition of the exterior tubes visible to the steamship clerk and truck driver; it does not establish the condition of the entire shipment. *Red Arrow Freight Lines, Inc. v. Howe*, 480 S.W.2d 281, 285 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n. r. e.); *Texas & Pac. Ry. v. George*, 466 S.W.2d 659, 661 (Tex.Civ.App.—Fort Worth 1971, no writ).

■ The evidence conclusively establishes that this shipment was materially damaged before its acceptance by Ramsey. Ramsey could not determine the extent of damage before it accepted the shipment. It is impossible to apportion the damage among the

numerous parties responsible therefor. Mitsui failed to prove its prima facie case, and under the facts of this case, we cannot hold Ramsey responsible for all of the damage.

In light of our holding, any errors possibly committed by the trial court were harmless. Tex.R.Civ.P. 434. Appellant's motion for rehearing is overruled.

Judgment affirmed.

Judgment rendered, and original Opinion filed June 8, 1977.

Appellant's motion for rehearing overruled, former Opinion ordered withdrawn.

Affirmed, and substitute Opinion on motion for rehearing filed July 27, 1977.