**OSCAR MAYER FOODS CORPORATION**

v.

**Tyree D. PRUITT, et al.**

**Tyree D. PRUITT, Individually, d/b/a Tyree D. Pruitt Trucking**

v.

**PUERTO RICO MARITIME SHIPPING AUTHORITY C/O Puerto Rico Marine Management, Inc.**

**Civ. No. K–93–2302.**

United States District Court, D. Maryland.

Sept. 19, 1994.

Terrence D. Jones, Arthur S. Garrett, III, Keller and Heckman, Washington, DC, for plaintiff.

James D. Skeen, Wright, Constable and Skeen, Baltimore, MD, for defendants and third-party plaintiffs.

M. Hamilton Whitman, Jr., Melissa A. Lengyel, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for third-party defendant.

## OPINION

FRANK A. KAUFMAN, Senior District Judge.

### FACTS RE: CASE IN CHIEF

This case involves the spoilage of two shipments of meats of plaintiff, Oscar Mayer Foods Corporation (hereinafter Oscar Mayer), which were sent by Oscar Mayer via refrigerated trailers (referred to in the industry and hereinafter as "reefers") from Oscar Mayer's facility in Haines City, Florida to Jacksonville, Florida on August 15, 1991 and August 29, 1991 respectively. Third-party defendant, Puerto Rico Maritime Shipping Authority, which operates Puerto Rico Marine Management, Inc. (hereinafter PRMMI), owned the reefers in question. Defendant and third-party plaintiff, Tyree Pruitt Trucking (hereinafter Ty Pruitt), leased the reefers from PRMMI for use on those dates.

In August of 1991, Oscar Mayer delivered to Ty Pruitt, at Oscar Mayer's Haines City facility, a large quantity of meat products. That quantity was divided at Haines City into five (5) parts. Two of those parts became what is hereafter referred to as shipments 1 and 2. Shipment 1, composed of roughly 33,770 pounds of perishable meats, was tendered on August 15, 1991 by Oscar Mayer to Ty Pruitt for transportation in reefer number TRIU854067 from Haines City to Jacksonville (hereinafter referred to as shipment 1). Ty Pruitt had received that reefer from PRMMI in Jacksonville, had set the thermometer in the reefer at twenty-eight (28) degrees fahrenheit, and had sealed the reefer, and had driven it to Oscar Mayer's Haines City facility some two hundred (200) miles away from Jacksonville. Pursuant to standard operating procedures only prechilled reefers were loaded in Haines City and the thermostats were, then and there, checked prior to loading and were rechecked when the reefer was sealed before its dispatch from Haines City to Jacksonville. On August 15, 1991, Oscar Mayer checked, in Haines City, to ensure that the temperature setting was at twenty-eight (28) degrees fahrenheit as required by the bill of lading. Approximately thirteen (13) hours after such sealing and departure from Haines City, the reefer arrived in Jacksonville. Upon opening the reefer, PRMMI discovered that the temperature inside the reefer exceeded fifty (50) degrees fahrenheit. Additionally, after "pulping" the product with a temperature probe, PRMMI discovered that the meat product was "hot." A Ty Pruitt driver then drove Shipment 1 back to the Haines City facility.

Similarly, on August 29, 1991, Oscar Mayer tendered a second load, consisting of roughly 37,428 pounds of perishable meats, to Ty Pruitt for transportation in reefer number TLMU504023 to and from the same points (hereinafter referred to as shipment 2). The aforementioned procedures concerning shipment 1 were followed with regard to shipment 2.

Upon their re-arrivals in Haines City from Jacksonville, Oscar Mayer inspected both shipments 1 and 2 to determine the extent of the damage. Oscar Mayer took top, middle and bottom samples from each pallet and checked them by inserting an electronic thermometer probe through the retail packaging into the meat product itself. Oscar Mayer determined that roughly one-third to one-half of shipment 1 had to be disposed of, as did more than one-half of shipment 2.[1] On Janu-

---

1. See Affidavit of James V. Baker, Jr. ¶¶ 27–28 and 40–41. Mr. Baker is a former Oscar Mayer employee who, at the time of the incident, was its

ary 23, 1992, Oscar Mayer filed, with Ty Pruitt, two separate damage claims, totaling $70,219.22, for the alleged aforementioned losses suffered due to the spoilage of the meats. On February 11, 1992, Ty Pruitt denied both of those claims.

### FACTS RE: THIRD PARTY CASE

On March 7, 1983 Ty Pruitt and PRMMI entered into a so-called Intermodal Equipment Exchange Agreement which covered, *inter alia,* the leasing of the reefers which Ty Pruitt used in shipments 1 and 2. According to the terms of that agreement, PRMMI made no warranty as to the condition of the reefers and Ty Pruitt accepted the equipment in "as is" condition.[2] The only role which PRMMI played under the contract with regard to shipments 1 and 2 was as lessor of the vans. In this litigation, Ty Pruitt has stated a third-party claim against PRMMI both in contract and in negligence, asserting that the sole cause for the spoilage of the meat was the malfunctioning of the reefers and seeking protection from any judgment which may be entered in this case in favor of Oscar Mayer against Ty Pruitt.

### SUMMARY JUDGMENT

Oscar Mayer and PRMMI have each filed summary judgment motions, contending that no genuine issues of material fact exist with regard to their claims in this litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). With respect thereto, the non-movant parties are entitled to have "all reasonable inferences ... drawn in [their respective] favor[s]." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1129 (4th Cir.1987). *See also Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir. 1985). The non-movants, however, " 'may not rest upon the mere allegations or denials of [their] pleadings' but instead 'must set forth specific facts showing that there is a genuine issue for trial.' " *Felty* at 1129 (cit-

ing Fed.R.Civ.P. 56(e)); *Ross,* 759 F.2d at 364. Indeed, a party resisting summary judgment must "go beyond the pleadings and by [its] own affidavits, ... depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the evidence offered by the non-movant is "merely colorable" or not "significantly probative", summary judgment will be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *see also Featherson v. Montgomery County Public Schools,* 739 F.Supp. 1021, 1025 (D.Md.1990) ("[a] mere scintilla of evidence in favor of the non-movant is insufficient to defeat a motion for summary judgment").

### CASE–IN–CHIEF LEGAL ISSUES

The Interstate Commerce Act is applicable in this case, specifically that part of it set forth in 49 U.S.C.A. § 11707 (the so-called Carmack Amendment). Pursuant to it, a common carrier is liable to the person entitled to recover under a bill of lading for actual loss to the property. 49 U.S.C.A. § 11701(a)(1). Additionally, a common carrier may not limit the liability imposed by § 11701(a)(1) except as provided by the said statute. None of those exceptions is applicable herein. *See* 49 U.S.C.A. § 11707(c)(1). Simply put, the Act imposes certain liability upon a carrier for damages caused to a shipper's product when that product is in the control of such carrier.

■ One of the statute's purposes is to create a uniform "national" scheme of carrier liability for damaged goods. *Adams Express. Co. v. Croninger,* 226 U.S. 491, 505–6, 33 S.Ct. 148, 151–52, 57 L.Ed. 314 (1913).[3] Additionally, it seeks to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment." *Fine Foliage of Florida, Inc. v. Bow-*

---

manager for its Florida and Caribbean distribution center located in Haines City.

**2.** *See* the Intermodal Equipment Exchange Agreement, § 3, ¶ 10.

**3.** *See also Shao v. Link Cargo Ltd.,* 986 F.2d 700, 704–5 (4th Cir.1993); *Hughes Aircraft Co. v. North American Van Lines,* 970 F.2d 609, 613 (9th Cir.1992).

*man Transportation, Inc.,* 901 F.2d 1034, 1037 (11th Cir.1990) (*citing Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 502–03, 94 L.Ed. 698 (1950)). Under the Act, the shipper establishes a *prima facie* case of the carrier's negligence and liability by showing:

(a) Delivery of goods to the carrier in "good condition;"

(b) Arrival of the goods in "damaged condition;" and,

(c) The "amount of damage."

*Missouri Pacific Rail Road Co. v. Elmore and Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 1144–45, 12 L.Ed.2d 194 (1964).[4] As Judge Kravitch stated, "[o]nce a plaintiff has made out a *prima facie* case under the Carmack Amendment, the burden of proof shifts to the carrier to show that the carrier was free from negligence and the damage was solely caused by '(a) an act of God; (b) an act of a public enemy; (c) an act of the shipper; (d) an act of a public authority; (e) or the inherent nature of the goods.' " *Fine Foliage,* 901 F.2d at 1039 (*citing Missouri Pacific Rail Road,* 377 U.S. at 137–38, 84 S.Ct. at 1144).[5]

■ Based on the pleadings, affidavits, and various exhibits filed herein, this Court concludes that Oscar Mayer has made out a *prima facie* case. To begin with, Oscar Mayer delivered its meat products to Ty Pruitt in "apparent good condition."[6] While Ty Pruitt challenges plaintiff's assertion that the meats were delivered in good condition, the record indicates otherwise. Ty Pruitt asserts that it has never admitted that the meat was in good condition, but only in "apparent[ly] good condition." But a shipper such as Oscar Mayer can rely upon circumstantial evidence, including bills of lading, U.S. Department of Agriculture approval, and statements by observers as to climate control and standard operating procedures in order to establish a *prima facie* case for delivery of goods in good condition. *Fine Foliage,* 901 F.2d at 1038; *Kaiser Aluminum,* 615 F.2d at 479.

Ty Pruitt also relies, at least in part, on the Federal Bills of Lading Act, 49 U.S.C.A. § 101 which limits carrier liability for products loaded by the shipper. Bills of lading which include language such as "in apparent good order" have been held to establish a *prima facie* case only for those portions of the shipment which are "open and visible." *Bluebird Food Products Co. v. Baltimore & Ohio Railroad Co.,* 474 F.2d 102, 104–5 (3d Cir., 1973); *World Wide Meats, Inc. v. Chicago & N.W. Transportation Co.,* 383 F.Supp. 807, 809–10 (N.D.Ia.1974). When shipments are made "under seal," as opposed to being unsealed, a shipper cannot rely solely on the bill of lading. *Van Wyk v. Fruitade,* 98 Md.App. 662, 670, 635 A.2d 14 (1994) (*citing Ed Miniat, Inc. v. Baltimore & Ohio Railroad Co.,* 587 F.2d 1277, 1280 (D.C.Cir. 1978)). Thus, in this case, since all of the meats were packaged and visual inspection by the carrier could not have fully determined the quality or condition of the meats, the shipper cannot rely solely on the bills of lading. Rather, it needs to present "persuasive proof, not merely the possibility, that the goods were shipped in good condition when entrusted to the carrier." *Id.* If it so does, a shipper can still prevail in such a situation if the shipper shows by evidence beyond the bill of lading that the goods were delivered in good condition.

Oscar Mayer has met its burden in this situation. The freight documents for both shipments 1 and 2 reveal that the shipments when received by the carrier were in "apparent good order."[7] In addition, it is to be noted, as discussed *supra,* that Ty Pruitt was the carrier for a total of five (5) shipments of

---

**4.** *See also Fine Foliage of Florida,* 901 F.2d at 1037; *Kaiser Aluminum & Chemical Corp. v. Illinois Central Gulf R. Co.,* 615 F.2d 470, 474 (8th Cir.1980) *cert. denied,* 449 U.S. 890, 101 S.Ct. 249, 66 L.Ed.2d 116 (1980); *Beautifax, Inc. v. Puerto Rico Maritime Management, Inc.,* 611 F.Supp. 537, 542 (D.Md.1985).

**5.** *See also Beautifax,* 611 F.Supp. at 542.

**6.** Some discussion takes place in the pleadings and motions over the word "apparent." Oscar

Mayer claims that the meats were tendered in good condition, thereby meeting its burden under the Carmack Amendment. 49 U.S.C.A. § 11707. In response, Ty Pruitt asserts that plaintiff has not sufficiently established the quality of this meat in the current summary judgment context of this litigation.

**7.** *See* Plaintiff's exhibits 1 and 9, Bill of lading Nos. 713–020979 and 713–021352. *See also* note 6, *supra.*

Oscar Mayer meats from Haines City to Jacksonville. All five (5) were loaded, sealed and driven from the Haines City storage facility to Jacksonville in a similar manner. However, only shipments 1 and 2 were found to be damaged when they arrived in Jacksonville. Since the rest of the meat products arrived in Jacksonville in good condition, one can infer that all five (5) shipments, including shipments 1 and 2, were indeed in good condition when they were tendered by Oscar Mayer to Ty Pruitt in Haines City. Also, it is further to be noted that it is undisputed that all of the goods shipped as above described, passed inspection by the U.S. Department of Agriculture before their departure from Haines City. Furthermore, Mr. Tyree Pruitt, the president of Ty Pruitt, has stated, in an affidavit, that in his opinion, based on his thirty (30) years of experience, the damage to the goods was due to equipment failure.[8] In sum, the evidence proffered by Oscar Mayer meets its *prima facie* burden of showing that the goods were in good condition when tendered to Ty Pruitt.

Ty Pruitt also submits that Oscar Mayer did not follow standard operating procedures by loading meats into a "hot" reefer and that thus, Ty Pruitt is not liable due to the fault of the shipper, Oscar Mayer. But in so contending, Ty Pruitt has failed to come to grips with the standard set forth in the Carmack Amendment and articulated in *Missouri Pacific Railroad v. Elmore & Stahl.* Once a shipper makes out its *prima facie* case, the burden is shifted to the carrier. The reefer was in the control of Ty Pruitt, not Oscar Mayer. Thus, if the temperature of the reefer upon loading was too high, it was not the fault of Oscar Mayer. Under *Missouri Pacific*, a carrier must prove that it was not negligent. Delivering and utilizing a "hot" trailer for shipment of perishable meat in August, in Florida, would clearly appear to constitute negligence, but negligence by Ty Pruitt, not by Oscar Mayer. The "responsibility for obvious improper loading generally rests on the carrier." *Franklin Stainless Corp., v. Marlo Transport Corp.,* 748 F.2d

865, 868 (4th Cir.1984). As a common carrier, Ty Pruitt had a duty to notify Oscar Mayer of the temperature problem and, at the very least, to suggest to Oscar Mayer not to load perishable meats into an over-warm trailer. Thus, as in *Fine Foliage* where the shipper loaded ferns into a trailer whose temperature was set too low, the carrier was under a duty to inspect and to note the improper temperature. 901 F.2d at 1039. Similarly, in *Van Wyk,* where the carrier failed to notice that the trailer was not properly cooled, the fact that the shipper negligently loaded raspberries causing them to become crushed, did not prevent the carrier's failure to notice the reefer temperature from being deemed independent negligence or to protect the carrier from liability to the shipper for damage during transit. *Van Wyk,* 98 Md.App. at 675.

The record indicates that Oscar Mayer's goods arrived in Jacksonville in damaged condition and that upon such arrival, the products were "pulped" and it was determined that the temperature of the meats was at least fifty (50) degrees fahrenheit. In his affidavit, Mr. Baker[9], citing to his more than fifteen (15) years of experience, has stated that "any meat product that has a temperature exceeding forty-one (41) degrees fahrenheit for a prolonged period of time (greater than one hour) is deemed to be unacceptable because bacteria in the meat begins to grow at such temperature levels."[10] Based on the pulping and the fact that shipments 1 and 2 were each in their respective reefers for more than thirteen hours, it would appear clear that the meat products were in a damaged condition when they arrived in Jacksonville and that the damage occurred while the meats were in Ty Pruitt's possession.

One essential element which a shipper must prove to succeed under the Carmack Amendment is specific damages. PRMMI hired Carson Brooks, Inc., an independent company which documented the damages to shipments 1 and 2 at $70,219.22.[11] Ty Pruitt claims that Oscar Mayer failed to

---

8. *See* Pruitt Affidavit, ¶ 9.

9. *See* note 1, *supra.*

10. *See* Baker Affidavit, ¶ 24.

11. *See* Plaintiff's exhibits 7 and 14.

mitigate its damages by allowing the damaged goods to remain in Jacksonville for more than four hours before returning them from Jacksonville to Haines City. However, such a four hour layover does not appear at all unreasonable. Thus, that argument by Ty Pruitt lacks merit.

■ Ty Pruitt also points to Oscar Mayer's failure to arrange for Ty Pruitt to be present at the damage surveys of the shipped goods. *Cf. Mitsui & Co. v. Ramsey Truck Lines, Inc.*, 554 S.W.2d 738 (Tex.Ct.App. 1977). Similar problems have arisen in cases involving damage to ships. In one of them, Judge Chase has written:

> [w]here the party charged with liability for the damage is not given notice of any survey of the·alleged damage and no excuse for such failure is shown, the claim of damage is to be viewed with some suspicion. In that respect it is enough to say that no lack of notice here shown would reasonably lead to any belief that the libellant was ever trying to conceal any facts or that respondent was deprived of an opportunity to make reasonable inspection of the gears. But, however, that may have been, such matters are only important as they serve as guides to decision as to the weight to be given the evidence relating to the facts in issue.

*Shepard S.S. Co. v. United States*, 111 F.2d 110, 113 (2d Cir 1940).

In another case involving damage to a ship, the Fifth Circuit has stated "the lack of a joint damage survey is not fatal." *See Delta Marine Drilling Company v. M/V Baroid Ranger*, 454 F.2d 128, 130 (5th Cir. 1972) (*citing Shepard* at 113). In the instant case, Ty Pruitt knew that the damaged goods were being returned to Haines City and also knew, due to its experience in the industry, that they would likely be inspected. With such knowledge, Ty Pruitt could seemingly easily have asked for and obtained the opportunity to be present when the surveys occurred. Thus, Ty Pruitt was not, in fact, deprived of any opportunity to be present at the damage surveys. Also there is no factual

dispute concerning what was observed by those present at the surveys or with regard to Oscar Mayer's claim that the actual damages suffered by it amounts to $70,219.22. In sum, Oscar Mayer is entitled to the grant of its summary judgment motion in the case-in-chief.

## *PRE–JUDGMENT INTEREST*

■ Plaintiff seeks an award of pre-judgment interest from January 1992, the time at which Oscar Mayer submitted its damage claims to Ty Pruitt. It is within the discretion of this federal district court to award pre-judgment interest in this case which involves a federal question. *See Poleto v. Consolidated Rail Corp.*, 826 F.2d 1270, 1279 n. 16 (3d Cir.1987). If the purpose of the substantive statute which is involved is to compensate a victim, then pre-judgment interest is appropriate. *Golden State Transit Corp. v. City of Los Angeles*, 773 F.Supp. 204, 216 (C.D.Cal.1991).

■ In this instance, the purpose of the Carmack Amendment is to compensate shippers whose goods are damaged while in the possession of a carrier. "Award of pre-judgment interest as part of the full actual loss is [accordingly] proper under the Carmack Amendment." *Co-Operative Shippers, Inc. v. Atchison, Topeka and Santa Fe Railway Co.*, 624 F.Supp. 797, 800 (N.D.Ill.1985).[12] As to the amount of pre-judgment interest, while federal law does not set forth a pre-judgment rate of interest, courts have applied the rate, set forth in 28 U.S.C.A. § 1961, to both pre-judgment and post-judgment interest awards. This case involves a broad federal statute involving interstate commerce. While no general interest rate is set forth in the statute, the latter does, with relation to certain matters such as rail tariffs, prescribe a rate of interest different from the general federal rate. *See* 49 U.S.C. § 10707(d)(1) & (2). As a general proposition, courts have applied the more specific rate of interest rather than the general rate guided by 28 U.S.C. § 1961. *Co–Operative*

---

**12.** *See also Action Drug Co., Inc. v. Overnite Transportation Co.*, 724 F.Supp. 269, 277 (D.Del. 1989).

*Shippers,* 624 F.Supp. at 800 (*citing Southern Pacific transportation Co. v. San Antonio, Texas,* 748 F.2d 266, 275 (5th Cir.1984)). Accordingly, this court, in the case-in-chief, will apply the rate indicated by 49 U.S.C. § 10707(d)(1) & (2), a rate equal to the average yield of marketable securities of the United States Government having a duration of ninety (90) days beginning as of January 23, 1992 and ending as of the date of the filing of this opinion.

### THIRD–PARTY CLAIM

■ Herein, Ty Pruitt seeks to proceed against PRMMI in contract and also in tort. As set forth *supra,* Ty Pruitt and PRMMI entered into what is known as an Intermodal Exchange Agreement. In *21st Century Property Co. v. Carpenter Insulation and Coating Co.,* 694 F.Supp. 148, 150 (D.Md. 1988), Judge Motz wrote that as "a general matter, the relationship of parties in privity with one another should be defined by contract rather than tort law." In other words, when a contract has been entered into, the parties' rights and obligations should be governed by that contract and not by tort law. As in *21st Century* the transactions between PRMMI and Ty Pruitt were strictly commercial and the parties, both experienced and sophisticated, were free to define their respective rights and liberties. *Id.* at 151. Under Florida law, a breach of contract alone, assuming there is one, is not sufficient to constitute an action in tort and a separate negligence action only comes into being if the breach of contract is accompanied by additional conduct which amounts to an independent tort. *Electronic Security Systems, Corp. v. Southern Bell Telephone and Telegraph Co.,* 482 So.2d 518, 519 (Fla.Dist.Ct. App.3d Dist.1986). In this litigation, Ty Pruitt has proffered no evidence, other than the four hour layover in Jacksonville discussed *supra,* that PRMMI breached any tort duties so as to establish an independent action. Therefore, PRMMI is entitled, as a matter of law, to summary judgment with regard to Ty Pruitt's negligence claim under Florida law which applies in the third-party case with regard to tort liability since Maryland applies the law of the state in which the tort occurred under Maryland's conflicts of laws approach. *See Sokolowski v. Flanzer,* 769 F.2d 975, 978 (4th Cir.1985).

■ As to Ty Pruitt's contract claim, namely that PRMMI failed to provide satisfactory reefers for the shipments from Haines City to Jacksonville, Ty Pruitt cannot ignore the fact that the contract involved is not a satisfaction contract but rather an "as is" contract. Section IV, ¶ 10 of the contract states that PRMMI "does not make any warranty or representation expressed or implied, as to the fitness or condition of the equipment interchanged ... and the carrier acquiring the use thereof does so at its own risk and accepts the equipment as is." Such an explicit waiver relieves PRMMI of any warranty as to the condition of the reefer. By definition, one who takes a product "as is" waives warranty claims. Under such a contract, Ty Pruitt assumed the obligation to prevent in the first place, or subsequently to repair during the lease period, any malfunction. Ty Pruitt knew what kind of contract it signed since the form of contract had been used by it for more than eight years when the alleged incidents in this case occurred. Ty Pruitt does assert that PRMMI sometimes repairs and/or fixes malfunctioning equipment but that problems due to driver error are the responsibility of a carrier.[13] But there would appear to be no requirement in the contract for PRMMI to do so. Additionally, Ty Pruitt points to § 4, ¶ 2(c) of the agreement, which states "at the time of interchange of a *loaded* vehicle under heat or refrigeration, interior air of vehicle will be at required temperature. The mechanical unit shall be in satisfactory operating condition ..." (emphasis added). However, that provision is irrelevant with regard to the within third-party dispute. PRMMI leased *unloaded* reefers to Ty Pruitt to transport shipments 1 and 2. There is no express or implied discussion in the Intermodal Exchange Agreement about the condition of *unloaded* reefers, the situation presented herein as to both shipments. Ty Pruitt cannot, therefore, read a clause applicable to

---

13. *See* deposition of Mr. Jose DelValle, the manager for shipping operations for PRMSA.

*loaded* reefers as applicable in the within third-party claim.

■ Ty Pruitt also argues that its Intermodal Exchange Agreement with PRMMI is a contract of adhesion. "The essential nature of contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the adhering party to negotiate except on a few particulars." *Rudbart v. Water Supply Commission,* 127 N.J. 344, 605 A.2d 681, 685, *cert. denied,* —— U.S. ——, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992).[14] Nothing in the record indicates that Ty Pruitt's contract with PRMMI is one of adhesion. Rather, it is a totally standard contract between two experienced, sophisticated companies of equal bargaining power which should not be mischaracterized as one of adhesion. This is not a case of "grossly disproportionate bargaining power." *Id.* 605 A.2d at 686. Nothing in the record indicates any difference in bargaining power between the two parties. Ty Pruitt cannot, therefore, as an informed business which has executed many similar contracts over the years, claim that it was forced to sign an "as is" contract or that it did not know the consequences of signing one. In sum, PRMMI is entitled to the summary judgment motion it seeks in the third-party case.

## CONCLUSION

For the reasons stated in this opinion, summary judgments will be entered for Oscar Mayer in the case-in-chief and for PRMMI in the third-party case.

---

**14.** Ty Pruitt and PRMMI agree that this contract is governed by New Jersey Law, the place where the contract was finalized.