**AIG EUROPE, S.A., Plaintiff,**

v.

**M/V MSC LAUREN, its tackle, boats, engines, etc., in rem, M/V MSC Chiara, its tackle, boats, engines, etc., in rem, M/V MSC Sextum, its tackle, boats, engines, etc., in rem, Mediterranean Shipping Company, S.A. and Locust Point Terminal Corporation, t/a Marine Freight Company, Defendants.**

Civil Action Nos. 2:95cv1024, 2:95cv1025.

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 15, 1996.

. Carter Branham Snow Furr, McGuire, Woods, Battle & Boothe, Norfolk, VA, for Plaintiff.

George William Birkhead, Edward James Powers, Vandeventer, Black, Meredith & Martin, Norfolk, VA, Timothy S. Brunick,

William L. Dudley, Jr., Knight, Dudley, Dezern & Clarke, Norfolk, VA, for Defendants.

### OPINION AND ORDER

MORGAN, District Judge.

On October 18, 1995, Plaintiff, AIG Europe S.A. ("AIG"), an underwriter, filed these actions against Defendants: Mediterranean Shipping Company S.A. ("MSC"); MSC's vessels M/V Chiara, M/V Sextum, and M/V Lauren *in rem;* and Locus Point Terminal Company, t/a Marine Freight Company ("Marine Freight"), seeking to recover damages it suffered as a result of missing cargo from two shipments of leather skins insured by AIG. These cases have been consolidated for trial.

Italian Leather S.P.A. ("I.L. Italy") is an Italian company in the business of manufacturing, tanning, and dying leather skins. I.L. Italy sent two shipments of leather skins from Italy to its subsidiary, Italian Leather USA, Inc. ("I.L. USA"), located in Randleman, North Carolina. Zeta Systems is an Italian corporation in the business of arranging the shipment of cargo for Italian shippers and was the general agent for I.L. Italy for both of these shipments.

Both shipments of skins were carried inside sealed multi-modal shipping containers. These containers are metal, rectangular, boxes that can be stacked aboard ships, loaded onto trains, or mounted upon truck trailer frames without having to disturb the container with each transfer. In this way the shipper's goods can travel from the manufacturer's warehouse, across oceans, and overland to the purchaser's warehouse without ever leaving its sealed container.

The first shipment consisted of ten (10) wooden pallets loaded into a twenty foot shipping container. Each pallet was stacked with twelve, six foot long cartons, each of which contained approximately twenty, tanned and dyed, leather skins. On September 23, 1994, I.L. Italy loaded these ten (10) pallets into an empty shipping container at their warehouse in Bitonto, Italy. The container doors were then closed, locked and sealed with a steel band-type seal belonging to I.L. Italy. The container was trucked,

accompanied by a Zeta Systems driver, to the port of Naples where MSC placed their own bolt-type security seal on the container doors. It remained at the port of Naples from September 23, 1994 until it was loaded aboard the MSC Chiara on September 27, 1994.

MSC issued a bill of lading to I.L. Italy for carriage from Naples, Italy to Norfolk, Virginia. The bill of lading described the cargo as "2,450 packages of skins tanned" and contained the disclaimer "shipper's load and count."[1] The gross weight was listed as 7,623 Kilograms. The bill of lading specified that the container was to be shipped aboard the M/V Chiara to Felixtowe, England where it was to be transshipped to the M/V Lauren and carried to Norfolk, Virginia. In fact, the container was carried aboard the M/V Chiara to LeHavre, France where it was transshipped to the M/V Lauren and carried to Portsmouth, Virginia. The container was off-loaded at Portsmouth Marine Terminal ("PMT")[2] on October 16, 1994 and remained there until October 21, 1994.

Marine Freight issued their own receipt/bill of lading[3] for overland carriage by truck from PMT to I.L. USA in Randleman, North Carolina. The bill of lading described the contents as "2,450 CTNS tanned skins" and listed the weight as 7,623 Kilograms.

On October 21, 1994 Marine Freight obtained the container from PMT. The driver and the guard at PMT checked the seals on the container and found them to be intact. The container was taken to Marine Freight's parking lot in Portsmouth, where it remained from October 21, 1994 until October 24, 1994.

On October 24, 1994 at 7:00 p.m. Marine Freight trucked the container to Randleman, North Carolina. The container remained on the truck overnight while the driver slept in the cab. At 9:00 a.m. the following morning,

an I.L. USA employee cut the seals and discovered that the container was short two (2) pallets.

The second shipment consisted of skins similarly packed onto nineteen (19) pallets and loaded into a forty foot shipping container. On November 30, 1994, the container was loaded, the doors closed and sealed with MSC's steel bolt-type security seal at I.L. Italy. That same day, a Zeta Systems driver trucked the container to the port of Naples.

As with the first shipment, MSC issued a bill of lading to I.L. Italy for carriage from Naples, Italy to Norfolk, Virginia. The bill of lading described the cargo as "4,484 packages skins tanned" and contained the disclaimer "shippers load and count." The gross weight was listed as 14,401 Kilograms. On December 9, 1994 the container was carried by the M/V Sextum to Felixtowe, England where it was unloaded for an unspecified time before being transhipped to the M/V Lauren and carried to PMT where it arrived on January 3, 1995.

The container remained at PMT from January 3, 1995 until 1:30 P.M. January 9, 1995, when Marine Freight picked up the container for delivery to Randleman, North Carolina. Marine Freight issued their own bill of lading for carriage overland by truck from PMT to I.L. USA in Randleman, North Carolina. The Marine Freight driver[4] and the PMT guard inspected the seal and found it to be intact. On the way to Randleman, the Marine Freight driver stopped at a truck stop in Emporia, North Carolina for 4½ hours, arriving in Randleman at 11:00 p.m. The container remained on the truck overnight while the driver slept in the cab. On January 10, 1995 at 8:00 a.m., an I.L. USA employee cut the seal and discovered that six (6) pallets were missing from the container.

---

**1.** The evidence presented at trial established that the cargo actually consisted 2,450 individual skins, packaged within 120 cartons, and loaded upon ten pallets. However, this misdescription had no effect upon the Court's holding.

**2.** Although the bills of lading provided for delivery to Norfolk, the containers were in fact off-loaded at Portsmouth Marine Terminal which is adjacent to Norfolk.

**3.** The document issued by Marine freight was described as a receipt by its office employees, but as a bill of lading by its drivers. The legal effect of the issuance of this document is the same regardless of its nomenclature.

**4.** Marine Freight provided different drivers for each of these deliveries.

## I. Analysis.

█ The evidence presented at trial established that all of the cargo in both containers was delivered intact to MSC in Naples, Italy, but that upon arrival in Randleman, North Carolina, two (2) pallets were missing from the first shipment and six (6) pallets were missing from the second shipment. Somewhere between Naples, Italy and Randleman, North Carolina the seals were detached, some cargo unloaded, and the seals reattached in such a way that a casual inspection did not reveal the tampering.[5] The evidence did not establish where the loss of the cargo occurred. Therefore, liability for the loss must be determined by the burdens of proof and presumptions applicable to the various bills of lading issued by the carriers of the containers. A bill of lading is a receipt given by a carrier for goods shipped, and a contract containing the terms of their carriage. Bills of lading for the carriage of "goods by sea to or from ports of the United States, in foreign trade" are governed by the Carriage of Goods by Sea Act ("COGSA"). 46 U.S.C. § 1300–1315 (1995). Domestic bills of lading issued by common carriers transporting goods in interstate commerce are governed by the Carmack Amendment.[6] 49 U.S.C. § 11707(a)(1) (1995).

In the case at hand, the shipments originated overseas and involved both an ocean carrier and a domestic overland carrier. The ocean segment of the shipment is clearly governed by COGSA. However, the bills of lading issued by MSC only covered the ocean leg of the shipment. Both of MSC's bills of lading list Norfolk as the port of discharge. Once the shipment reached PMT, the bills of lading for the ocean leg of the shipments

terminated. *Reider v. Thompson,* 339 U.S. 113, 117, 70 S.Ct. 499, 501–02, 94 L.Ed. 698 (1950). New bills of lading were issued by Marine Freight to cover the domestic overland leg of the shipment from Norfolk to Randleman, North Carolina. Thus, Marine Freight's liability will be governed by the Carmack Amendment.

## II. Liability of MSC.

█ Under COGSA, to establish a *prima facie* case for recovery against MSC, the Plaintiff must prove that (1) intact containers[7] were delivered to MSC, and (2) that MSC delivered less than intact containers to Norfolk. *Reider,* 339 U.S. at 118, 70 S.Ct. at 502; *Bally, Inc. v. M.V. Zim America,* 22 F.3d 65, 69 (2nd Cir.1994).

█ At the close of Plaintiff's case, the Court found that there was *prima facie* evidence that I.L. Italy loaded both shipping containers with the specified number of pallets and that they were delivered intact to MSC in Naples, Italy. This evidence was not rebutted by MSC, therefore, the first half of the *prima facie* case against MSC was proven.

Plaintiff's evidence also established that less than a full container was delivered to Randleman, North Carolina. The goods disappeared somewhere between Naples, Italy and Randleman, North Carolina. The ocean transportation lasted approximately twenty days for each shipment, while the overland segment was only four day for the first shipment and less than one day for the second shipment. During the ocean voyage the containers were off-loaded at a foreign port, where they remained for unspecified periods

---

5. Subsequent inspection of the seals from both shipments established that they had been removed and reattached. These seals consist of two pieces, a male bolt section and a female receptor. When the male section is inserted into the female section it locks into place and cannot be removed. The seal number is stamped into the female receptor end of the seal. In order to open the doors of the container, the bolt seal had to be cut. Apparently, after cutting the bolt the thieves drilled out the remaining male section from the female receptor end of the seal. Then a new male bolt was inserted into the original female receptor and held in place by either adhesive or friction. Upon casual inspection the seal

would appear intact and unaltered because only the female end of the seal has the seal number stamped into it.

6. The original Carmack Amendment, formerly 49 U.S.C. § 20(11), was repealed, but the substantive provisions of Carmack were recodified at 49 U.S.C. § 10730 and 11707 (1995). On December 29, 1995 these sections of the code were omitted in the general revision of United States Code Title 49.

7. The term "intact containers" refers both to the condition and the quantity of the cargo.

of time before being loaded aboard the M/V Lauren and shipped to PMT. From this evidence the Court could infer that the cargo was not delivered by MSC to Norfolk intact and complete. Based upon this permissible inference, the Court **DENIED** MSC's motion for a Rule 52(c) Judgment as a Matter of Law at the conclusion of the Plaintiff's evidence. *See* Fed.R.Civ.P. 52(c).

While the plaintiff's evidence permitted this inference, it did not compel such a finding. Plaintiff's already weak case as to the second prong of the COGSA test was undermined by MSC's evidence that its methods of storing shipping containers aboard its vessels virtually eliminated the possibility of theft at sea. Additionally, PMT and Marine Freight employees both indicated that the seals were intact when Marine Freight Picked up the containers. After considering all of the evidence, the preponderance does not establish that MSC failed to deliver full containers of skins to PMT.

Therefore, the Court **FINDS** for defendant MSC.

The *in rem* defendants are **DISMISSED** without prejudice because they were never served.

### III. *Liability of Marine Freight.*

■ Under the Carmack Amendment, to establish a *prima facie* case for recovery against Marine Freight, Plaintiff must prove that (1) intact containers were delivered to Marine Freight, and (2) that Marine Freight delivered less than intact containers to Randleman, North Carolina. *Missouri Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144–45, 12 L.Ed.2d 194 (1964); *Oscar Mayer Foods Corp. v. Pruitt*, 867 F.Supp. 322, 326 (D.Md.1994). The evidence was undisputed that Marine Freight delivered less than intact containers to Randleman, North Carolina. The real issue as to Marine Freight is the first prong of the Carmack test; whether Plaintiff established that the containers were intact when Marine Freight picked them up at PMT.

■ The Plaintiff asserted that the Last Carrier Rule relieved it of the burden of proving that the containers were intact when they were delivered to Marine Freight. The Last Carrier Rule establishes a presumption of liability upon the last carrier when a through bill of lading is issued. *The Madow Company v. S.S. Liberty Exporter*, 569 F.2d 1183, 1186 (2nd Cir.1978). A through bill of lading is a single document governing the transshipment of goods through the hands of more than one common carrier. Under the Last Carrier Rule, if the shipper can show that it delivered all of the goods to the initial carrier, and that the last carrier delivered less than all the goods, a presumption is established that the last carrier received the goods in the same condition and quantity as the first carrier. *Id.* at 1185. The last carrier is liable for the loss unless it can show that a prior carrier was responsible for the loss.

■ However, the Last Carrier Rule is not applicable to the case at hand. The ocean carrier issued a bill of lading contracting for delivery of the containers to Norfolk, Virginia. Once the containers reached PMT, the contract for ocean transportation terminated. Marine Freight issued their own bills of lading for transportation to Randleman, North Carolina. The obligation of Marine Freight originated when it picked up the containers at PMT. Unless Plaintiff can satisfy the first prong of the Carmack test, that the containers were intact when received by Marine Freight, Marine Freight is not liable. *Reider*, 339 U.S. at 118, 70 S.Ct. at 502.

■ Marine Freight issued clean bills of lading specifying the number of skins and the containers' gross weight when it picked up the containers at PMT. A "clean bill of lading" acknowledging receipt of cargo in good order with no exceptions noted is sufficient to establish delivery in good condition of cargo open to inspection. *National Transp., Inc. v. Inn Foods, Inc.*, 827 F.2d 351, 354 (8th Cir.1987) (citations omitted). Marine Freight maintains that because the containers were under seal and not open to inspection, it cannot be held accountable for receiving an intact container.

■ When goods are delivered to a carrier under seal, or packaged in such a way that the carrier is unable to inspect the goods,

courts have held that the bill of lading can only attest to the condition of cargo ascertainable from the exterior of the container. *Pillsbury Co. v. Illinois Central Gulf R.R.*, 687 F.2d 241, 244 (8th Cir.1982). In such circumstances, the shipper must produce other evidence in addition to a clean bill of lading to show that the shipper delivered the cargo to the carrier in good condition.[8] *National Transp.*, 827 F.2d at 354; *Oscar Mayer*, 867 F.Supp. at 326. These cases typically involve shipments of spoiled food, corroded steel, or otherwise damaged goods where the damage can only be ascertained through a physical inspection of the goods. Because such an inspection is not possible when goods are shipped inside a sealed container, additional evidence must be presented to establish that the carrier received the cargo in good condition.

In the case a hand, the issue in dispute involves the quantity, not the condition, of the cargo when Marine Freight picked up the containers at PMT. Despite the presence of a sealed container, Plaintiff presented evidence establishing that Marine Freight received its shipping containers intact.

■ First, Marine Freight issued clean bills of lading specifying the gross weight of the containers. The gross weight of the containers was ascertainable from the exterior of the containers. All Marine Freight had to do was weigh the containers. When a carrier issues a clean bill of lading for cargo open to inspection, whether or not the carrier does in fact inspect the cargo, it will be held liable for delivery of the cargo in good condition. *National Transp.*, 827 F.2d at 354; *Oscar Mayer*, 867 F.Supp. at 326. Similarly, when a carrier issues a bill of lading declaring the gross weight of the container without reservations, whether or not the carrier does in fact weigh the container,

it will be liable for receipt of that gross weight. *Cf. Bally*, 22 F.3d 65 (2nd Cir.1994) (under the COGSA the weight listed on a bill of lading is *prima facie* evidence of receipt of that weight); *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30 (2nd Cir.1982) (same). Marine Freight chose not to weigh the container yet listed the weight on their bills of lading without any reservations such as "shippers weight."[9] In such circumstances, Marine Freight's issuance of clean bills of lading specifying the weight of the containers constitutes *prima facie* evidence of receipt of containers of the specified gross weight.

■ Secondly, additional evidence was presented that established that intact containers would have had the gross weight specified on the bills of lading. As previously discussed, MSC received intact containers at Naples, Italy. The bills of lading issued by MSC listed the gross weight of each shipping container. Evidence at trial established that these weights were accurately determined by adding the weight of the containers to the weight of the skins as determined by manufacturer's invoices and packing lists. Marine Freight's bills of lading specified the exact same gross weight as MSC specified on their bills of lading. The missing cargo weighed over 1,000 pounds per pallet, thus a weighing procedure would have revealed the loss of any pallets.[10]

Having established that: (1) Marine Freight issued clean bills of lading specifying the gross weight; (2) that it had the opportunity to weigh the containers; and (3) that the actual weight of intact containers would have equaled the gross weight specified on the bills of lading, Plaintiff has proven that Marine Freight received the containers intact. This, combined with the uncontroverted evidence that the containers were delivered to

---

8. In this case the term "delivery in good condition" would include delivery of the total quantity of cargo shipped.

9. The Court does not consider here the legal effect of disclaimers such as "shipper's weight" or "said to weigh." However, the Court notes that under COGSA, the weight listed on a bill of lading is *prima facie* evidence that the carrier received that weight of cargo despite any such disclaimers. *Bally*, 22 F.3d at 69.

10. Heavy equipment was required to remove the pallets from the container and a drill press or the like was required to remove and replace the seal. In addition, multiple persons were required to accomplish these tasks undetected. All this suggests that motivation beyond the value of the leather in issue was present, but this theory remains a suspicion not proven by or permissibly inferred from the evidence.

I.L. USA with cargo missing, establishes Plaintiff's *prima facie* case against Marine Freight under the Carmack test.

■ Once the Plaintiff establishes its *prima facie* case, the burden of proof shifts to the carrier to prove that damages were caused by one of the recognized exceptions relieving the carrier of liability.[11] *Missouri Pac.*, 377 U.S. at 138, 84 S.Ct. at 1144–45. This shift is based upon the premise that the carrier is in the best position to ascertain the condition of the goods at the time it receives them, and is the only one in a position to determine what actually happened to the shipment while in its possession. *Id.* at 144, 84 S.Ct. at 1148. Marine Freight was in a better position than the Plaintiff to ascertain whether or not it was receiving intact containers.[12] The seal did not prevent Marine Freight from weighing the containers to ascertain whether or not the cargo was intact. Had Marine Freight weighed the containers, it would have discovered whether the shortages were present at the time of weighing. Marine Freight does not argue that any of the exceptions relieving the carrier of liability apply, and could not reasonably so argue given the facts of this case.

For the aforementioned reasons, the Court **FINDS** for Plaintiff against Marine Freight.

### IV. Conclusions.

The time and place of the losses remains a mystery. Counsel for each party candidly represented to the Court in opening statements that they did not expect the evidence to solve this mystery despite their best efforts to investigate and discover the cause of the losses. The evidence revealed that at least one similar loss occurred involving the same shipper but different ocean and overland carriers. In weighing the evidence the court did not find the evidence of any one party more credible or persuasive than any other party.

Accordingly, the Court must rely upon the tests for establishing a *prima facie* case under COGSA and Carmack. The plaintiff cannot meet the second prong of the COGSA test as to MSC and the Court therefore **FINDS** for MSC. As to Marine Freight, Plaintiff proved the first prong of the Carmack test by establishing that: (1) the carrier issued clean bills of lading specifying the containers gross weights; (2) the carrier had the opportunity to weigh the containers; and (3) the actual weight of intact containers would have equaled the gross weight specified on the bills of lading. The evidence is undisputed that Plaintiff meets the second prong of the Carmack test as to Marine Freight. The fact that Marine Freight was in a better position than the shipper to detect the loss, by means of a weighing procedure, supports the finding that the losses should be borne by the land carrier as opposed to the shipper.

The Court **FINDS** for defendant MSC and **DISMISSES** the *in rem* defendants without prejudice because they were not served.

The Court **FINDS** against defendant Marine Freight. The Court further **FINDS** damages in civil action no. 2:95cv1024 in the amount of $43,727.21 plus $1,606.33 in survey fees, and in civil action no. 2:95cv1025 in the amount of $127,645.25 plus $2,850.17 in survey fees. Prejudgment interest is not appropriate in this case because Marine Freight disputed liability in good faith. However, the Court does award Plaintiff its taxable costs and interest at the judgment rate of 5.9 percent from September 11, 1996 forward.

The Clerk is **REQUESTED** to send a copy of this Order to counsel for both parties.

It is so **ORDERED.**

---

11. "The carrier is responsible without regard to the exercise of due care, even though the damage or loss be occasioned by the independent act of third persons." *Missouri Pac.*, 377 U.S. at 139 n. 9, 84 S.Ct. at 1145 n. 9 (1964) (citation omitted).

12. Marine Freight was also in a better position than MSC to weigh the container. Evidence was presented that it is unusual and impracticable for

carriers to weigh containers upon delivery at PMT because its standard procedure is to weigh only outbound containers. However, Marine Freight had access to a commercial weigh station at which they could have weighed the containers. *See Bally*, 22 F.3d at 71 (making reference to Ocean Carrier Conferences *amicus curiae* brief noting that most U.S. ports only weigh outbound containers).